## S00A1393. JONES v. THE STATE.

(539 SE2d 143)

SEARS, Justice.

The appellant, Adam Jones, appeals from his convictions for the malice murder of Michael Sanders and for the possession of a firearm during the commission of a felony.[1] On appeal, he contends that the trial court erred in denying his motion to suppress the pre-trial and in-court identifications of several witnesses; that the trial court erred in charging the jury on the factors it could consider in assessing the reliability of identification testimony; that the trial court erred in admitting evidence of two prior difficulties between Jones and the victim; and that the evidence is insufficient to support his convictions. We conclude, however, that these contentions are without merit. Accordingly, we affirm Jones's convictions.

1. On the night of November 19, 1996, the victim, Michael Sanders, was found near a path between some woods and a row of houses on Pickfair Avenue in Fulton County. He had sustained three gunshot wounds, including one to the head, from which he later died. Sanders lived with Tameka Tucker in an apartment near where he was found. Tucker testified that on the evening of the shooting, she and Sanders were at their apartment with the appellant, Adam Jones. Tucker testified that Jones and Sanders left the apartment, saying they were going to rob someone. Each of them was carrying a .38 caliber handgun, and Jones was wearing a red Tommy Hilfiger

---

[1] The crimes occurred on November 19, 1996, and Jones was indicted on June 17, 1997. On November 2, 1998, a jury found Jones guilty of malice murder, felony murder, aggravated assault, and the possession of a firearm during the commission of a felony. The trial court merged the felony murder and aggravated assault convictions with the conviction for malice murder, and sentenced Jones to life in prison for malice murder and to five consecutive years in prison on the possession conviction. On November 16, 1998, Jones filed a motion for new trial. On May 14, 1999, the court reporter certified the trial transcript. On October 4, 1999, Jones amended his motion for new trial, and on November 16, 1999, the trial court denied Jones's motion for new trial. On November 17, 1999, Jones filed a notice of appeal, and on May 5, 2000, the appeal was docketed in this Court. On September 11, 2000, the case was orally argued.

jacket, jeans, and a white shirt. Tucker testified that Jones returned alone to the apartment a few minutes after he and Sanders left with the guns, and that he was no longer wearing the Tommy Hilfiger jacket. Tucker also testified that Jones told her that he had shot Sanders, and that if she told anyone, he would shoot her. Jones had two guns with him at the time, and told Tucker that he had taken Sanders's gun from him after the shooting. According to Tucker, Jones left the apartment and ran down the street. She then called the police. On cross-examination, Tucker testified that Sanders at one time had told her that he had shot at someone named Corey Walker because Walker had threatened him. Tucker stated that she could not remember when that occurred.

Zelda Ware, James Ware, and Don Mosley testified that on the evening of November 19, they were in the living room of the Wares' home on Pickfair Avenue watching television. Zelda Ware testified that her dog started to bark, and that the three of them looked out a window. Ms. Ware testified that she saw two young men walking down the street. In this regard, she stated that it was dark in her house except for the television, and that a street light outside her house was very bright, enabling her to clearly see the two men. She stated that she saw their faces and what they were wearing. She added that Jones was wearing a red jacket and a skull cap. Ms. Ware testified that a brief moment later, they heard gunshots, and looked out the window again. She stated that she saw Jones jogging back past her house, and that he was not wearing his jacket. They then called 911. Ms. Ware also testified that the police brought Jones by her house later that evening; that the police asked her to identify Jones; that Jones was sitting in the back of a police car; that the officer shone a flashlight on Jones; and that she identified him. She also stated that she later identified him at the police station when he was sitting alone in a room, and that she picked Jones out of a photographic lineup at the police station, but that she could not remember how many pictures were in the lineup. Finally, Ms. Ware testified that she had no doubt that Jones was the person she saw that evening.

Mr. Ware and Mr. Mosley testified to a similar version of events as that of Ms. Ware. Moreover, while Jones was sitting by himself in a police car shortly after the shooting, Mr. Ware identified Jones as the man who came jogging by his house after the shots were fired. Mr. Ware also identified Jones at the police station while Jones was sitting in a room by himself, and he testified that there was no doubt in his mind as to his identification either before trial or at trial. Although Don Mosley did not make a pre-trial identification of Jones, he testified at trial that Jones was the man who came jogging past the house after the shots had been fired.

DeMarco Woodruff, who testified that he was a friend of Jones, testified that Jones had told him twice that he intended to kill Sanders. Woodruff added that the second threat was about a week before the shooting, and that Jones stated he was going to kill Sanders on the path where Sanders's body was found.

At trial, Jones testified that the day before Sanders was killed, he and Corey Walker were at Tucker's apartment, and that he, Walker, and Sanders left to walk to a store. While walking, Sanders asked Walker if he could borrow his gun, and Walker agreed. According to Jones, after Walker gave Sanders his gun, Sanders took off running, and Walker and Jones returned to Tucker's apartment. Jones added that a short time later, Sanders arrived at the apartment, and said he was going to shoot Walker. Walker ran out the front door, and Sanders fired two shots at him. Jones testified that he stayed at Tucker's apartment until November 19, and that he went home about 6:00 p.m. He added that he went back to Tucker's apartment about 10:00 p.m. on November 19, but that Sanders was not there at that time, and that he (Jones) left the apartment and walked to a nearby gas station. Jones denied killing Sanders, and testified that he did not remember telling Woodruff that he was going to kill Sanders.

Jones's father testified in his defense. He stated that Corey Walker came to his house on November 19, 1996, about 2:30 a.m., and attempted to obtain a gun by saying that Jones had sent him to get his gun. Jones's father testified that Walker told him that Sanders had taken Walker's gun and shot at him twice; that he (Walker) knew where Sanders lived; and that he was going to "smoke" him.

Contrary to Jones's contention, we conclude that reviewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found Jones's guilty beyond a reasonable doubt of malice murder and the possession of a firearm during the commission of a felony.[2]

2. Jones contends that the trial court erred in failing to grant his motion to suppress the pre-trial identifications of Zelda Ware and James Ware and the in-court identifications of Zelda Ware, James Ware, and Don Mosley. We conclude that the trial court did not err in admitting the testimony.

When it denied Jones's motion to suppress, the trial court ruled that the pre-trial identification procedures used at the police station were impermissibly suggestive. The court, however, denied the motion to suppress on the ground that, considering the totality of the circumstances, there was not a substantial likelihood of misidentifi-

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

cation. When a trial court concludes that an identification procedure is impermissibly suggestive, the issue becomes whether, considering the totality of the circumstances, there was a substantial likelihood of irreparable misidentification.[3] If not, then both the pre-trial and in-court identifications are admissible.[4] Factors to be considered in determining whether there was a substantial likelihood of misidentification include:

> (1) the witness's opportunity to view the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the accused; (4) the witness's level of certainty at the confrontation with the accused; and (5) the length of time between the crime and the confrontation. The ultimate question is, whether under the totality of the circumstances, the identification is reliable.[5]

Moreover, "[i]n evaluating these factors, the trial court is the trier of fact and must judge the credibility of the witnesses and the weight and conflict in the evidence. Where evidence supports the trial court's ruling, we will not disturb that ruling."[6]

Because the witnesses in question had two opportunities to observe Jones on the night in question; because there was testimony that the witnesses had the chance to see Jones under a bright street light; because the witnesses all gave consistent descriptions of how he was dressed and of his skin complexion; because the witnesses were all certain of their identifications; and because the initial identifications of Jones occurred shortly after the crimes, we cannot conclude that the trial court erred in ruling that there was not a substantial likelihood of misidentification. Accordingly, we conclude that the trial court did not err in denying Jones's motion to suppress.

3. In our recent decision in *Johnson v. State*,[7] we held that

> the admission of expert testimony regarding eyewitness identification is in the discretion of the trial court. Where eyewitness identification of the defendant is a key element of the State's case and there is no substantial corroboration of that identification by other evidence, trial courts may not

---

[3] *Semple v. State*, 271 Ga. 416, 418 (519 SE2d 912) (1999); *Neil v. Biggers*, 409 U. S. 188, 198-199 (III) (93 SC 375, 34 LE2d 401) (1972); *Thomason v. State*, 268 Ga. 298, 303 (3) (486 SE2d 861) (1997); *Whatley v. State*, 266 Ga. 568 (2) (468 SE2d 751) (1996).

[4] See *Neil v. Biggers*, 409 U. S. at 198-199.

[5] (Citations omitted.) *Semple*, 271 Ga. at 418.

[6] *Lowe v. State*, 264 Ga. 757, 758 (452 SE2d 90) (1994).

[7] 272 Ga. 254, 255-257 (526 SE2d 549) (2000).

exclude expert testimony without carefully weighing whether the evidence would assist the jury in assessing the reliability of eyewitness testimony and whether expert eyewitness testimony is the only effective way to reveal any weakness in an eyewitness identification. However, the admission or exclusion of this evidence "lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion."[8]

Moreover, in a footnote in *Johnson*, we noted that the trial court in that case had used the pattern charge on identification, which

directs the jury to assess the reliability of eyewitness identification in light of the following factors: the opportunity of the witness to view the alleged perpetrator; the degree of attention the witness displayed at the time of the viewing; the possibility of mistaken identity; the influence other sources might have on the identification; prior misidentifications by the witness; and "[t]he level of certainty shown by the witness about his/her identification."[9]

We further noted that experts have questioned "the common belief that an eyewitness who is certain of his identification is more accurate than other eyewitnesses," but noted that Johnson had not alleged any error regarding the language in the charge authorizing the jury to consider the eyewitness's level of certainty in determining the reliability of the identification.[10]

In the present case, Jones raises several issues concerning an eyewitness's confidence or certainty in his or her identification. First, he contends that the trial court erred in denying his motion in limine to preclude Zelda Ware, James Ware, and Don Mosely from testifying that they were confident or certain in their identification of Jones. He further contends that the trial court erred in using the "level of certainty" charge discussed in *Johnson* in charging the jury in this case, and that the court erred in refusing to give his requested charge on eyewitness identification. For the reasons that follow, we find no reversible error.

(a) We first address Jones's contention that the trial court erred in permitting Zelda Ware, James Ware, and Don Mosely to testify that they were confident or certain in their identification of Jones. First, we note both that Jones offers no case law to support his con-

---

[8] (Citations omitted.) Id. at 257.
[9] (Emphasis supplied.) *Johnson*, 272 Ga. at 260, n. 6.
[10] Id.

tention that an eyewitness may not testify as to the certainty of his or her identification, and that the certainty or lack of certainty of an eyewitness's identification has always been deemed a relevant factor in considering an eyewitness's testimony.[11] To support this contention, Jones relies on studies that purport to show that there is an unreliable connection between a witness's confidence in an identification and the accuracy of the identification.[12] These studies, however, do not demonstrate that every eyewitness's confidence in the accuracy of his or her testimony is misplaced. Instead, the studies depict "group character" behavior,[13] offering expert information "about how groups of people perceive and react as a basis for evaluating the claims of an eyewitness in a particular case."[14] As such, although expert testimony may be admissible under *Johnson* to demonstrate the general lack of a correlation between confidence and accuracy, thus impacting the weight to be given such testimony, we conclude that the studies on which Jones relies do not render every eyewitness's testimony regarding his or her confidence inherently unreliable and inadmissible.[15] Moreover, contrary to Jones's contention, we conclude that the witnesses' testimony concerning the confidence of their identification did not amount to an impermissible opinion regarding an ultimate issue, as the ultimate issue of the witnesses' veracity was left to the jury.[16]

(b) We next address Jones's contention that the trial court erred in using the "level of certainty" charge in instructing the jury. Because we conclude that, even if it was error to give this instruction, any error in doing so was harmless, we pretermit whether this instruction should continue to be given in cases involving eyewitness identification.[17] First, in this case, although the eyewitness evidence

---

[11] E.g., *Semple*, 271 Ga. at 416; *Neil*, 409 U. S. at 198-199; *Thomason*, 268 Ga. at 303.

[12] See, e.g., Wells, Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads, 22 Law & Hum. Behav. 603 (1998); Penrod & Cutler, Eyewitness Confidence and Accuracy: Assessing their Forensic Relation, 1 Psych. Pub. Pol. & Law 817 (1995).

[13] Robert P. Mosteller, Syndromes and Politics in Criminal Trials and Evidence Law, 46 Duke L. J. 461, 504 (1996).

[14] Id. at 491.

[15] See generally *Davis v. State*, 272 Ga. 327, 330 (528 SE2d 800) (2000) (discrepancies in an eyewitness's testimony goes to its weight and not its admissibility); *Chapel v. State*, 270 Ga. 151, 156 (510 SE2d 802) (1998) (conflicting expert opinions on test results go to the weight rather than the admissibility of the testimony).

[16] See *Barlow v. State*, 270 Ga. 54, 55 (507 SE2d 416) (1998). See also *Mitchell v. State*, 228 Ga. App. 74, 76 (491 SE2d 127) (1997) ("the degree of certainty that a witness has in his own testimony is highly relevant").

[17] In this regard, we note that while some courts have discontinued the use of such a charge, e.g., *State v. Long*, 721 P2d 483 (Utah 1986); *Commonwealth v. Santoli*, 680 NE2d 1116, 1121 (Mass. 1997), other courts continue to include the "level of certainty" language in their charge on eyewitness identification, *People v. Johnson*, 842 P2d 1, 26-27 (Cal. 1992); *State v. Robinson*, 754 A2d 1153, 1158-1159 (N.J. 2000).

was important, there was other significant evidence of Jones's guilt, and this evidence corroborated the testimony of Ms. Ware, Mr. Ware, and Mr. Mosely. Specifically, Tameka Tucker, who was well-acquainted with Jones, testified that Jones and the victim left her apartment, saying they were going to rob someone; that Jones was wearing a red Tommy Hilfiger jacket, jeans, and a white shirt when he left the apartment; that Jones returned alone to the apartment a few minutes later; and that at that time, Jones was no longer wearing the Tommy Hilfiger jacket. Tucker also testified that Jones told her that he had shot Sanders, and that if she told anyone, he would shoot her. Tucker's testimony not only strongly implicated Jones in the crime, it also corroborated Ms. Ware's, Mr. Ware's, and Mr. Mosely's testimony as to what Jones was wearing when he passed their house, as well as their testimony that he was not wearing the jacket when he came back by their house after shots were fired. Moreover, Tucker lived close to the eyewitnesses and thus placed Jones near their home at the time the eyewitnesses testified that they saw him. In addition to Tucker's testimony, an acquaintance of Jones testified that Jones told him that he intended to kill the victim. Furthermore, not only were the testimonies of the eyewitnesses corroborated by Tucker's testimony, they all gave consistent descriptions of Jones, they were not under stress when they saw Jones, they had good lighting by which to see him, and they identified him shortly after the crime.[18] Finally, the trial court charged the jury that the state had the burden to prove Jones's identity beyond a reasonable doubt. It also charged on the possibility of mistaken identification, as well as on several other relevant considerations, including the opportunity of the witnesses to view Jones at the time of the alleged incident; the witness's degree of attention towards Jones; whether the witnesses' "identification may have been influenced by factors other than the view the witness[es] claimed to have"; and whether the witness had failed to identify Jones on previous occasions as the alleged perpetrator.

Considering all of the foregoing factors, we conclude that, if any error occurred in giving the "level of certainty" charge, it was harmless.

(c) Jones also contends that the trial court erred in failing to give his requested charge on eyewitness identification. We conclude, however, that most of the requested charges were covered in general by the pattern jury charges, including the pattern charge on the state's burden of proof regarding identity. Jones's requested charge, however, also requested the court to charge that "[a]n eyewitness's cer-

---

[18] See *Johnson*, 272 Ga. at 258.

tainty . . . does not necessarily bear on the correctness of the identification," and that "some believe that an eyewitness's confidence is among the least significant factors in predicting the accuracy of an identification." For the same reasons, however, that we concluded that the error, if any, in including the "level of certainty" charge in the trial court's instruction to the jury was harmless, we also conclude that, even if the trial court erred in failing to give this portion of Jones's requested charge, any error in failing to do so was harmless.

4. Contrary to Jones's contention, we conclude that the trial court did not err in admitting the testimony of DeMarco Woodruff regarding Jones's statements that he intended to kill Sanders.[19]

For the foregoing reasons, we affirm Jones's convictions.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 20, 2000 —
RECONSIDERATION DENIED DECEMBER 14, 2000.

*Drew, Eckl & Farnham, James J. Lacy, John T. Chason*, for appellant.

*Paul L. Howard, Jr.*, District Attorney, *Bettieanne C. Hart, Christopher M. Quinn*, Assistant District Attorneys, *Thurbert E. Baker*, Attorney General, *Paula K. Smith*, Senior Assistant Attorney General, *W. Swain Wood*, Assistant Attorney General, for appellee.

---

[19] *Wall v. State*, 269 Ga. 506, 509 (500 SE2d 904) (1998); *Ward v. State*, 271 Ga. 648, 651 (520 SE2d 205) (1999).