## A04A1738. GIBBS v. THE STATE.
### (606 SE2d 83)

PHIPPS, Judge.

Johnny Gibbs was convicted of armed robbery and possession of a firearm during the commission of a felony. He moved for a new trial on grounds which included ineffective assistance of his trial attorney. After a hearing, the trial court entered an order denying Gibbs's motion without explanation. Gibbs appeals. We conclude that he is entitled to a new trial because of ineffective assistance of counsel and reverse.

Frank Lloyd worked at The Sports Authority sporting goods store in Lilburn. He was in charge of the firearms department. Lloyd testified that on September 17, 1999, a black male approximately 5'10" tall and weighing about 190 to 200 pounds appeared in the store asking about guns. According to Lloyd, the man threatened him with a gun and forced him to place a half-dozen handguns from The Sports Authority's inventory into a box before fleeing the store with the guns. Three days before robbery of the Lilburn store, The Sports Authority store in the Northlake Mall area of Atlanta had been robbed. Personnel from the Northlake store had given Lloyd a description of that robber.

On December 23, 2000, more than a year after The Sports Authority robberies, City of Fayetteville police officer Terrell Bunn stopped Gibbs for reckless driving. One of the handguns stolen from The Sports Authority in Lilburn was found in Gibbs's possession. Bunn testified that during the traffic stop Gibbs told him of the presence of the handgun in the glove compartment of the car. City of Fayetteville police officer Linda Lash testified, however, that Gibbs later told her that he had not been aware that the gun was in the car. Defense witness Rodney Shivvers, a friend of Gibbs, testified that he had seen Gibbs in possession of the gun.

On December 6, 2001, Detective Keith Wiggins of the Gwinnett County Police Department incorporated Gibbs's picture into a six-person photographic lineup and displayed the lineup to Lloyd. Lloyd positively identified Gibbs as the robber in the lineup and at trial. At trial, Lloyd testified that he was 100 percent certain of both his pretrial and in-court identifications of Gibbs as the robber. Lloyd testified that the store had been well lit, that he had ample opportunity to view the robber at a close distance, and that he had a heightened level of concentration on the details of the robber's physical appearance because the robber fit the description of the robber of the Northlake store days earlier.

During cross-examination of Lloyd, defense counsel established that Lloyd had not mentioned anything to the police about the robber having any distinctive physical features, such as tattoos or gold teeth.

And counsel sought to have Gibbs display to the jury his tattoos and gold teeth. The prosecuting attorney objected, arguing that Gibbs could have acquired the tattoos or gold teeth after the robbery. Defense counsel stated that he could produce "records that will prove when the teeth came in." The prosecuting attorney announced that he would object to any introduction of such documents on the ground that the defense had not complied with its reciprocal discovery obligation to provide the state with the documents. The record reflects that after the prosecutor stated that he would object, defense counsel did not attempt to introduce any documents except for one August 1999 photograph of Gibbs. This photograph of Gibbs's face with his mouth closed was admitted without objection.

Also on cross-examination, Lloyd testified that he estimated the robber's height at about 5'10", because he (Lloyd) is about 5'8" in height and the robber was taller than him. Defense counsel then asked Lloyd to stand back-to-back with Gibbs and they stood back-to-back in the presence of the jury. Outside the presence of the jury, counsel later commented that it had appeared that Gibbs was actually about one and one-half to two inches shorter than Lloyd.

Defense counsel introduced the testimony of two witnesses, Shivvers and Rashetta Kimbro (Gibbs's girlfriend and the mother of his child), to show that Gibbs had numerous tattoos and gold teeth years before the robbery. Kimbro testified that the tattoos and gold teeth were what had attracted her to Gibbs in July 1999. The defense also presented an expert witness to testify about the increased likelihood of mistakes in cases of cross-racial identification, such as here (where the eyewitness was white and the defendant was black).

At the hearing on his motion for new trial, Gibbs's new lawyer introduced photographs of Gibbs that were taken by trial counsel or his investigator at the jail, shortly before the trial, as well as dental records that showed that Gibbs's gold teeth were implanted years before the robbery and an undated hospital record that showed Gibbs weighed about 230 pounds.

1. Construed in a light most favorable to the state, the evidence was sufficient to support the verdict.

> [A]n appellate court does not weigh the evidence or determine witness credibility but only determines whether the evidence is sufficient under the standard of *Jackson v. Virginia.* . . . Conflicts in the testimony of the witnesses, including the [s]tate's witnesses, [are matters] of credibility for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact

necessary to make out the [s]tate's case, the jury's verdict will be upheld.[1]

2. Gibbs charges his trial attorney with ineffective assistance in failing to obtain admission of documentary evidence at trial.

> In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the [defendant] that there is a reasonable probability, i.e., a probability sufficient to undermine confidence in the outcome, that but for counsel's unprofessional errors the result of the proceeding would have been different. The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct.[2]

A trial court's conclusion that the defendant received effective assistance of counsel will be upheld unless it is clearly erroneous.[3]

Trial counsel announced that he could introduce exculpatory documentary evidence about when Gibbs acquired gold teeth but failed to offer such evidence after the state announced that it would object based on counsel's noncompliance with his reciprocal discovery obligations. Failure to comply with reciprocal discovery obligations which results in the loss of an opportunity to introduce exculpatory evidence may constitute deficient performance. Whether trial counsel chose to introduce documents he had in his file would, in itself, be a matter of trial tactics and strategy. But trial counsel in this case precluded himself from using the documents — if, during the trial, he realized he needed them — because he failed to comply with the reciprocal discovery rules. We must ask, not only whether any reasonable trial counsel might have decided not to introduce the dental records, but also whether any reasonable trial counsel would have, as trial strategy, failed to protect his opportunity to use the records. Trial counsel's performance was deficient because he failed to disclose the exculpatory documentary evidence after opting in to reciprocal discovery, not simply because he failed to use the evidence.

Is there a reasonable possibility that, but for this deficient performance, the outcome of the trial would have been different? We conclude that there is.

---

[1] (Citations and punctuation omitted.) *Brewer v. State*, 219 Ga. App. 16, 17 (1) (463 SE2d 906) (1995).

[2] (Footnote omitted.) *McMillian v. State*, 263 Ga. App. 782, 785 (3) (589 SE2d 335) (2003).

[3] *Castillo v. State*, 263 Ga. App. 772, 775 (4) (589 SE2d 325) (2003).

Gibbs's defense was mistaken identity. Lloyd testified on cross-examination that he was very close to the robber during the robbery, observed him for three to five minutes, and that he engaged the robber in conversation while trying to stall long enough for the police to arrive. Therefore, as asserted by the defense, if the robber had gold teeth they should have been visible to Lloyd. Lloyd testified that he had a completely unobstructed view of the robber as he walked toward him in the store. He observed him approach from a distance of 50 feet. He testified that the robber was wearing a baseball cap that covered "only the very top part of the forehead," that there were no other obstructions of the robber's face except a beard, and that the robber was two or three feet from him, just on the other side of the counter display case.

Lloyd testified that the store was "very well lit" and that he was robbed "directly beneath" a 500 or 1000 watt halogen light. He testified that his level of concentration on the robber was at first "a little heightened," then "very intense." He said he tried to "get as many details as I could about his face, body characteristics, every detail that happened." He testified that he "tried to pay attention to absolutely every detail down to the number and name on the back of the [robber's] jersey." He said that he had looked at the robber for three to five minutes. On cross-examination, Lloyd recalled telling defense counsel's investigator that there was nothing about the robber's teeth that he could remember. He said that the robber had had no braces or missing teeth and that he had not noticed any gold teeth or anything unusual about the robber's face or mouth.

At trial, the state argued that Gibbs could have acquired his tattoos and gold teeth after the robbery. To support Gibbs's claim of mistaken identity, defense counsel introduced the testimony of two witnesses, Shivvers, a friend, who was impeached with his criminal record and Kimbro, a girlfriend, with an obvious bias or prejudice in favor of Gibbs. Although the photographs of Gibbs introduced at the motion for new trial hearing, showing his multiple tattoos, would not have corroborated the defense witnesses' testimony because they were taken two years after the robbery, and the hospital record showing Gibbs's weight was not dated and thus not probative of Gibbs's weight at the time of the robbery, the credibility of the dental records was not subject to challenge on such grounds.

Moreover, the dental records were not merely cumulative of Kimbro's general testimony that Gibbs had gold teeth. The dental records introduced at the hearing on the motion for new trial would have shown that in October 1993 Gibbs had various gold designs implanted on the six upper teeth in the front of his mouth. These were described in the records as "solid," "moon," "cross," and "spade," among others. The records also showed that in January and April

1995 Gibbs had received solid gold implants for his two lower left front teeth and two lower right front teeth. Thus, according to the dental records defense counsel had in his file, at the time of the robbery in September 1999, Gibbs had gold teeth of various designs, including at least six solid gold teeth, on most, if not all, of the teeth visible in the front of his mouth.

Aside from Lloyd's identification of him, the only evidence of Gibbs's guilt was his possession of a stolen gun more than a year after the robbery. But because Gibbs's possession of the stolen handgun could not be characterized as "recent," under the law it did not give rise to an inference that he stole the gun.[4] Thus, the state's case against Gibbs was based almost entirely on Lloyd's identification of him, making the strength of his defense of mistaken identity particularly crucial. There is no question that the dental records would have disproved the state's argument that Gibbs might have acquired the gold teeth sometime after the robbery. Also, it would have corroborated the impeached and biased testimony of the defense witnesses, Shivvers and Kimbro. There is a reasonable probability that Gibbs's defense was prejudiced by his defense attorney's inability to corroborate their testimony with the dental records and thereby disprove the state's argument about the gold teeth, thus weakening the state's argument against mistaken identity. It is reasonably probable that admission of such evidence would have successfully challenged Lloyd's identification of Gibbs and changed the outcome of the trial. Therefore, in this case, as in *Tenorio v. State*,[5] the defendant is entitled to a new trial.

3. As to Gibbs's remaining claims of error, the trial court was fully authorized to find that the photographic lineup was neither constructed nor shown to the prosecution witness in an impermissibly suggestive manner.[6] Nor did the court err in admitting evidence that Gibbs used a false name and had a large quantity of money in his possession at the time of his arrest.[7] Arguably, however, the court did err in instructing the jury that a witness's level of certainty is a factor which may be considered in assessing the reliability of the witness's identification of the accused.[8] The remaining claims of error either

---

[4] Compare *In the Interest of A. L.*, 255 Ga. App. 215 (1) (564 SE2d 823) (2002) (evidence of recent, unexplained or unsatisfactorily explained possession of stolen goods may be sufficient to give rise to an inference that defendant committed burglary).

[5] 261 Ga. App. 609, 611-613 (3) (583 SE2d 269) (2003).

[6] See *Williams v. State*, 275 Ga. 622, 623 (2) (571 SE2d 385) (2002); *Padilla v. State*, 273 Ga. 553, 554 (1) (544 SE2d 147) (2001); *Brodes v. State*, 250 Ga. App. 323, 325 (2) (551 SE2d 757) (2001).

[7] See *McNeil v. State*, 257 Ga. App. 147, 148 (570 SE2d 433) (2002).

[8] See *Jones v. State*, 273 Ga. 213, 218-219 (3) (b) (539 SE2d 143) (2000) (concluding that any

are not supported by reference to the record or transcript,[9] or are moot.

*Judgment reversed. Smith, C. J., and Johnson, P. J., concur.*

*Axam, Adams & Secret, Tony L. Axam, Asha T. Rodney,* for appellant.

*Daniel J. Porter, District Attorney, David K. Keeton, Assistant District Attorney,* for appellee.

---

error in giving "level of certainty" charge was harmless; pretermitting whether instruction should continue to be given).

[9] See generally *Mann v. State*, 244 Ga. App. 756, 761 (9) (536 SE2d 608) (2000).

