A01A1196. HENG v. THE STATE.
(554 SE2d 243)

BARNES, Judge.

Pip Heng appeals his convictions for aggravated assault and two counts of armed robbery, contending that insufficient evidence supports his aggravated assault conviction. Heng also alleges the trial court erred by denying his motion to suppress identification testimony and denying his request for a new jury panel. For the reasons that follow, we affirm.

1. We view the evidence on appeal in the light most favorable to the verdict and no longer presume the defendant is innocent. We do not weigh the evidence or decide the witnesses' credibility, but only

---

determine if the evidence is sufficient to sustain the convictions. *Taylor v. State*, 226 Ga. App. 254, 255 (485 SE2d 830) (1997).

Viewed in the light most favorable to the verdict, the evidence at trial established that late in the evening on July 31, 1999, the Clarkston police received reports of two separate armed robberies that took place within a short period of time and within blocks of each other. Both victims reported that two Asian teenage boys robbed them, and that one of the two pointed a 9 mm handgun at them while demanding money. The gunman was described as between five feet two inches and five feet four inches tall, weighing 120 to 130 pounds, with hair closely shaved to above his ear and long hair on top, wearing an orange sleeveless shirt or jacket.

The first victim handed over his money clip, which contained a $100 bill on which someone had written "800." The victim had noticed the number written on the bill when he got it from the bank and described it to the police when he reported the robbery. The second victim gave up his leather bag, and the gunman fired his weapon at the victim after discovering that it had nothing of value in it.

The next day, a detective searched the area where the gun had been fired and recovered one 9 mm Fiocchi shell casing. He remembered seeing a report of a burglary from the day before, which listed a box of Fiocchi ammunition and a Glock semi-automatic handgun among the stolen items, so he interviewed the burglary victim and obtained the gun's serial number.

That evening, the day after the armed robberies, another police officer radioed the detective who found the spent shell and reported he saw four teenage Asian males standing outside an apartment complex, one of whom was wearing a sleeveless orange jacket as had been described by the victims. The detective drove up in his unmarked Crown Victoria, wearing his uniform, and asked the boy in the orange jacket if he could talk to him for a minute. The boy, who was Heng, put his hands to his waistband, and the detective got out of the car with his service weapon drawn but not pointed. He ordered Heng to stop and show his hands, but Heng started jogging away while tugging at something in his waistband. Heng finally pulled a Glock 9 mm semi-automatic handgun from his pants and threw it into the bushes about three yards from the detective, who subsequently caught and restrained Heng, then retrieved the gun.

The officers handcuffed Heng and took him and the other three teenagers to the police station. A search uncovered a $100 bill in Heng's wallet, with the number "800" written on one side. The detective contacted the first victim at that time, who came to the station within a few minutes. In the parking lot outside, the victim identified the Glock as similar to the one used to rob him and identified the $100 bill as his. Acting on the detective's instructions, he opened the

door to the station, looked at the four boys standing in front of a bench, and nodded that he recognized one of them. They closed the door, and the victim identified Heng as the gunman who robbed him.

The detective contacted the second victim two days later, who came to the station to view a photo array of five young Asian males. This victim also identified Heng as the boy who robbed him at gunpoint and fired the gun afterward and the Glock as similar to the one used against him.

The victim whose home was burglarized the night before the robberies identified as his the Glock Heng threw in the bushes, based on the weapon's serial number, and confirmed that someone had also stolen 50 rounds of Fiocchi ammunition from his home. An expert firearms examiner from the state crime lab testified that the Fiocchi shell casing the detective found at the scene of the second robbery was fired by the Glock Heng threw in the bushes before his arrest.

2. Heng argues that the trial court should have granted his motion to suppress testimony regarding his pre-trial identification as the robber in the lineup and the photo array and his in-court identification by the two victims. The trial court held that neither the lineup nor the photo array was impermissibly suggestive. We disagree.

In both pre-trial situations, Heng was the only person in the group wearing orange, in fact an orange sleeveless jacket as both victims had described to the police. Further, the first victim identified the stolen bill and handgun before looking at the four teenagers, so he knew the police had a suspect in custody. While some of the photos shown to the second victim were closely cropped so their clothes were not visible, Heng's photo revealed more of his upper body and showed his orange jacket clearly. Finally, while both victims identified Heng at trial as the person who robbed them, Heng was the only Asian in the courtroom at the time.

The test for determining whether a due process violation occurred in cases like this "is whether the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (Citation and punctuation omitted.) *Randolph v. State*, 246 Ga. App. 141, 147 (4) (538 SE2d 139) (2000). We have found that a photo array was not impermissibly suggestive when the defendant was heavyset and some of the men pictured were not. *Green v. State*, 219 Ga. App. 878 (467 SE2d 203) (1996). Nor was an array impermissibly suggestive when the defendant had the darkest skin and the witness had described him as having a very dark complexion. *Smith v. State*, 209 Ga. App. 540, 543 (4) (433 SE2d 694) (1993). Further, we have found photo arrays or lineups not impermissibly suggestive when the defendant's clothing differed from the others' in some respect, because in those cases, the witnesses had not described their assailants as wearing the clothing

the defendant wore when he was identified. *Jackson v. State*, 209 Ga. App. 53, 54 (1) (432 SE2d 649) (1993); *Denegal v. State*, 193 Ga. App. 238 (1) (387 SE2d 434) (1989); *James v. State*, 157 Ga. App. 645, 646 (2) (278 SE2d 187) (1981).

However, in this case, Heng was wearing an orange, sleeveless jacket which both victims had described the gunman as wearing. The police stopped to talk to Heng because he was Asian and was wearing such a jacket, and Heng was the only person wearing orange in both the physical lineup and the photo array. While Heng otherwise matched the description the victims gave — his age, ethnicity, hair, and stature — so did everyone else in the lineups. Simply having him remove his jacket before including him in a lineup or taking his picture for the photo array would have cured this problem, but we find that placing Heng in the lineup and photo array wearing an unusual jacket exactly matching the victims' description was impermissibly suggestive. "An identification procedure is impermissibly suggestive when it leads the witness to an 'all but inevitable identification' of the defendant as the perpetrator." *Miller v. State*, 270 Ga. 741, 743 (2) (512 SE2d 272) (1999). See *Smith v. State*, 244 Ga. App. 165, 166 (1) (534 SE2d 903) (2000) (A lineup showing a shirtless man when the attacker was shirtless "is far less suggestive than, for example, one in which the suspect is shown wearing the same clothing worn by the attacker.").

We must next consider whether, considering the totality of the circumstances, the impermissibly suggestive identification procedures led to a substantial likelihood of irreparable misidentification. *Jones v. State*, 273 Ga. 213, 216 (2) (539 SE2d 143) (2000). In determining whether there was a substantial likelihood of misidentification, we consider these factors:

> (1) the witness's opportunity to view the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the accused; (4) the witness's level of certainty at the confrontation with the accused; and (5) the length of time between the crime and the confrontation. The ultimate question is, whether under the totality of the circumstances, the identification is reliable.

Id.

Applying these factors, we find there was not a substantial likelihood of irreparable misidentification. The first victim testified that Heng put a 9 mm handgun to his head and did all the talking, speaking very good English. The victim remembered well "the fire" in Heng's eyes, the way he was looking at him, and further described

"the rage in [Heng's] eyes when he looked at me, when he asked for what I had, and I gave it over to him." After the victim gave up his money, Heng said, "I don't want to see you around here any more." The victim looked right into Heng's eyes and responded, "Whatever you say." The following day, the victim was "very certain" when he identified Heng in a lineup. He did not remember that Heng wore orange in the lineup and said he did not identify Heng because the police had shown him the marked $100 bill and the gun beforehand. Rather, he identified Heng because it was "the night right after, I remembered the face, I remembered the terror in his eyes when he looked at me, the way he demand [sic] and everything." The victim identified Heng at trial as the boy who robbed him.

The second victim's encounter with Heng lasted around 45 seconds, and during that time, Heng pointed a gun at the victim and shouted at him to get on his knees. Heng became angry when the victim refused to kneel, and, as he circled the victim, the victim turned to keep his face toward Heng's. Two days later, the victim identified Heng in the photo lineup "immediately" after "just a second" and was "very certain" of his identification. He testified that he identified Heng because he knew and recognized his face. The second victim also identified Heng in the courtroom as the man who robbed him.

While the lineup and photo array were impermissibly suggestive because Heng was the only person wearing an orange jacket, we find that there was no substantial likelihood of irreparable misidentification, and evidence of the pre-trial identifications was properly admitted. *Gresham v. State*, 246 Ga. App. 705, 706 (1) (541 SE2d 679) (2000).

Further, Heng did not object to the in-court identifications and has, therefore, waived objection to it on appeal. *Furlow v. State*, 272 Ga. 795, 796 (2) (537 SE2d 61) (2000); *Clark v. State*, 236 Ga. App. 153, 155 (2) (510 SE2d 907) (1999).

3. We conclude that the evidence as outlined above was sufficient for a rational trier of fact to find Heng guilty beyond a reasonable doubt of aggravated assault. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The police found a $100 bill belonging to the first victim in Heng's wallet, and forensics matched the shell casing at the scene of the second victim's robbery to the gun Heng possessed. *Huff v. State*, 239 Ga. App. 83, 86 (1) (519 SE2d 263) (1999).

4. Heng asserts that the trial court erred in denying his motion to strike the jury panel. Voir dire was not transcribed for the record. After voir dire was completed, the parties met in chambers and Heng moved to strike the entire panel based on remarks by one juror that Heng looked like a punk. The venireman also said his grandparents had come over from Germany and made something of themselves, while Heng "comes over here and commits crimes." The trial court

struck the juror for cause but declined to strike the entire panel, explaining that the court could not hear everything the juror said and therefore the entire panel could not have heard everything he said either. The court further explained:

> I am not going to remove the entire panel, because I don't think he tainted the panel, especially in light of the additional questions that were asked by all the other jurors when they were asked certain questions, primarily by the State, is there anything else that could cause you not to be fair and impartial. And so everybody was given an opportunity at different times.

The conduct of voir dire is within the trial court's sound discretion, which we will not disturb unless that discretion is abused. *Hughey v. State*, 180 Ga. App. 375, 377 (2) (348 SE2d 901) (1986). Here, the trial court dismissed the juror for cause, and nothing in the record disputes the trial court's conclusion that the remaining jurors indicated that they could be fair and impartial. "Although the comments were clearly directed at appellant, . . . they did not necessarily imply guilt of the offense under consideration," they did not link Heng to other crimes, and they were not inherently prejudicial. *Callaway v. State*, 208 Ga. App. 508, 512 (2) (431 SE2d 143) (1993). "There is no reason to conclude that any juror was prejudiced by the statement, which was one of personal opinion based on observation of the defendant and was not related to the charges for which he was being tried." *Butts v. State*, 198 Ga. App. 368, 370 (3) (401 SE2d 763) (1991), overruled on other grounds, 266 Ga. 417, 418 (467 SE2d 574) (1996). The trial court did not abuse its discretion in denying Heng's motion to strike the jury panel.

*Judgment affirmed. Smith, P. J., and Phipps, J., concur.*

DECIDED AUGUST 17, 2001.

*Demetria N. Gibson*, for appellant.

*J. Tom Morgan, District Attorney, Robert M. Coker, Jeanne M. Canavan, Assistant District Attorneys*, for appellee.