No. 106,093

STATE OF KANSAS, *Appellee*, v. TONY TREMAYNE LEWIS, *Appellant*.
(326 P.3d 387)

Opinion filed June 13, 2014.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant, and *Tony T. Lewis*, appellant pro se filed a supplemental brief.

*Barry R. Wilkerson*, county attorney, argued the cause, and *Barry K. Disney*, assistant county attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

BILES, J.: Tony T. Lewis was charged with multiple offenses following a series of attacks against three women during April and May of 2009 in Riley County. The general pattern for these crimes was that each victim was unknowingly followed to her apartment in the early morning hours after being out for the evening. Two women were raped and sodomized, while the third escaped after a struggle. Lewis appeals his convictions for rape, aggravated criminal sodomy, burglary, kidnapping, aggravated assault, aggravated kidnapping, and aggravated robbery. He was sentenced to five life imprisonment sentences as an aggravated habitual sex offender under K.S.A. 2009 Supp. 21-4642 based on his prior convictions for sexually violent crimes in Geary County.

Lewis advances numerous issues, which we have reordered for clarity: (1) failure to suppress his statements to police; (2) failure to suppress pretrial and in-court victim identifications; (3) denial of a continuance; (4) prosecutorial misconduct during closing argument; (5) error responding to a mid-deliberation jury inquiry; (6) insufficient evidence to support alleged alternative means under the rape statute; (7) cumulative trial error; and (8) error sentencing him as an aggravated habitual sex offender.

We affirm his convictions, but vacate his five life sentences and remand for resentencing because the aggravated habitual sex offender statute, which was the basis for those sentences, did not apply to him. See *State v. Trautloff*, 289 Kan. 793, 798, 217 P.3d 15 (2009) (aggravated habitual sex offender defined under K.S.A. 2009 Supp. 21-4642 as a person convicted on and after July 1, 2006, of a sexually violent crime who has already been convicted on at least two prior conviction events of any sexually violent crime). Additional facts are described as applicable to each issue.

## Suppression of Statements Made to Police

Lewis had an encounter with a Riley County police officer at about midnight on May 28, 2009. It began when the officer observed a white Dodge Avenger blocking an apartment complex driveway. The vehicle matched a description the officer had previously been advised to watch for. The officer saw a man exit the car, so the officer left his patrol vehicle and the two spoke. Lewis identified himself and said he was lost. Lewis said he was walking away from his car because he did not have cell phone service and was trying to locate another apartment complex. The officer gave Lewis directions, but noticed Lewis did not follow them as he drove away.

Later that day, a Riley County police detective learned about the encounter and wanted to follow up with Lewis, who was on active military duty at the Fort Riley Military Reservation. The detective arranged for an interview at Fort Riley's Criminal Investigation Command (CID) office, where he met a CID special agent who summoned Lewis. The CID agent testified the protocol for local police wishing to talk to a soldier at Fort Riley is for CID to contact the soldier's unit to have the soldier come to the CID office. This was the typical procedure for a suspect, witness, or victim stationed at the base.

After waiting awhile for Lewis, the detective and agent got into an unmarked vehicle and went to look for him. The detective observed the white Dodge the patrolling officer had described from the previous night parked in front of Lewis' barracks. The detective and agent then saw Lewis get into the Dodge and drive toward the CID office. The officers pulled up, asked if Lewis was looking for CID, and then told him to follow them there. Lewis drove by himself.

When they arrived at the CID office, the detective told Lewis he wanted to discuss the previous night's encounter with the officer. The detective later testified Lewis seemed relaxed and agreeable to speak. The two spoke for less than 10 minutes in an interview room at the CID office, while the CID agent watched from another room. Lewis was not handcuffed or restrained. Lewis was

not under arrest, but the detective did not advise him that he was free to leave. Prior to the detective's interview, the CID agent took Lewis' cell phone, keys, and wallet because CID policy was to remove everything from an interviewee's pockets before entering the interview room.

The detective testified at trial that during this first conversation, he asked Lewis what he was doing at the apartment complex, who he was looking for when he encountered the officer, what he did off-post, and whether he had been to certain area nightclubs. Lewis said he had visited Club Eve and Mustangs in Junction City and Bushwhacker's in Manhattan. The detective did not explain why he was inquiring about specific clubs.

After this first interview, the CID agent and the detective decided to jointly interview Lewis. Going back into the interview room, the CID agent advised Lewis of his "Article 31 rights" under the Uniform Code of Military Justice, which are similar to *Miranda*. See 10 U.S.C. § 831 (2012) (right against self-incrimination; prior to questioning, accused or suspect must be advised of nature of accusation, right to refrain from making statement, and that statement may be used as evidence at trial by court-martial); *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966). The detective and agent advised Lewis he was suspected of sexual assaults in Geary and Riley Counties. Lewis waived his rights and agreed to continue speaking with the two investigators.

The CID agent later testified that Lewis told them he frequented Club Eve's and Bushwackers and had a .45 caliber handgun and a mask in his car. The second interview lasted about 20 minutes and ended when Lewis requested a lawyer after the CID agent discussed obtaining DNA samples.

Law enforcement officers executed search warrants for Lewis' barracks and car, recovering two black handguns, a black ski mask, a white "Jason"-style mask, new size-12 Nike ACG tennis shoes, black gloves, and a grey and black scarf, as well as other items of clothing consistent with the victims' accounts of what their attacker had been wearing. Lewis' roommate consented to a police search of the roommate's Ford Fusion, which matched the vehicle de-

scription linked to one of the attacks. Police found a traffic ticket issued to Lewis inside.

After he was charged, Lewis moved to suppress his statements taken at the CID office and the resulting evidence. The district court conducted an evidentiary hearing on the statements' admissibility. See *State v. Bogguess*, 293 Kan. 743, 751, 268 P.3d 481 (2012) (State has burden to prove defendant's statement was voluntary; truthfulness not at issue); see also *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). The district court ruled the detective followed "proper channels at CID" and determined the statements were voluntary, even though they were initiated when CID asked Lewis to come to its office. The district court pointed out that Lewis drove his own vehicle to the interview and then stated:

"When you look at the factors on all of these cases, length of time of the interview, the circumstances surrounding it, and the nature of the interrogation, at all times when he was talking to [the detective], [the detective] stated he was free to go. The first time that he was not free to go is when [the CID agent] read him his rights, and not only that, but informed him of the reason his rights were being read to him. The defendant waived those rights, and agreed to talk to him, and provided him with certain information. For those reasons, the Court will deny the defendant's motion to suppress the stop, and obviously the motion to suppress the—any statements that were made either to [the detective or the CID agent]."

On appeal, Lewis argues the district court erred when it refused to suppress his statements to the detective because he was in custody when the detective interviewed him and the detective failed to *Mirandize* him. He extends this argument to the second interview with both the CID agent and detective by claiming it was tainted by the un-*Mirandized* first interview, even though the CID agent advised Lewis of his Article 31 rights and the nature of the allegations and Lewis consented to the questioning.

*Standard of Review*

The *Miranda* safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation. A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. A custodial

interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage. *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012); see *State v. Bridges*, 297 Kan. 989, 1002, 306 P.3d 244 (2013).

Factors to consider in determining if an interrogation is investigative or custodial include: (1) the interrogation's time and place; (2) its duration; (3) the number of law enforcement officers present; (4) the conduct of the officer and the person questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, *e.g.*, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. No single factor outweighs another, nor do the factors bear equal weight. Every case must be analyzed on its own particular facts. *Warrior*, 294 Kan. at 496.

An appellate court reviews a trial court's determination whether an interrogation was custodial employing two distinct inquiries. Under the first, the appellate court decides the circumstances surrounding the interrogation, employing a substantial competent evidence standard of review.

In determining if there is substantial competent evidence supporting the existence of the circumstances found by the trial court, an appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. The second inquiry employs a de novo standard of review to determine whether, under the totality of those circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. 294 Kan. at 497.

*Discussion*

"Prior to the preliminary examination or trial a defendant may move to suppress as evidence any confession or admission given by him on the ground that it is not admissible as evidence." K.S.A.

22-3215(1). The State bears the burden of proving the challenged statements are admissible. K.S.A. 22-3215(4); see also *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013) (when challenged, the prosecution must prove by a preponderance of the evidence the voluntariness of a defendant's statement to a law enforcement officer). Statements made during custodial interrogation are inadmissible "unless the State demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination." *State v. Hebert*, 277 Kan. 61, 68, 82 P.3d 470 (2004).

Lewis argues a reasonable person in his situation would not have felt free to terminate the first interview with the detective because: (1) the interview occurred in an interview room at the CID office; (2) he relinquished his keys, cell phone, and wallet; (3) he was ordered by a superior officer from his unit to report to CID; (4) his "military superiors were standing right outside the room"; (5) the detective never told Lewis he was free to leave; and (6) the CID agent testified Lewis would not have been free to leave because the agent would have wanted to talk to Lewis immediately after the detective's interview.

Several factual contentions made by Lewis are unsupported or contradicted by the record. First, the record does not indicate Lewis' military superiors were outside the interview room. It reflects only that the CID agent observed the interview from another room. There is no evidence the agent was Lewis' superior. Second, there is nothing in the record about how Lewis learned he was wanted at CID, much less that he was ordered by a superior officer to report to CID. Third, the argument about the CID agent's testimony is false. The agent testified Lewis was not free to leave during the agent's questioning in the second interview—not before the detective's first interview.

Looking at the facts, some circumstances point in favor of finding the detective's interview was noncustodial: (1) it was very short; (2) Lewis seemed relaxed; (3) the detective told Lewis his purpose was simply to follow-up on the patrol officer's encounter the previous night, and the questioning was confined to this topic and Lewis' off-base activities; (4) only the detective was in the interview room with Lewis; (5) Lewis drove to the CID building in his own

car, albeit with an escort; and (6) Lewis was not physically restrained or under guard. On the other hand, some circumstances weigh in favor of considering the interview custodial: (1) it essentially occurred in a police station; (2) Lewis was not being questioned just as a witness, but as a person of interest in the crimes; (3) Lewis surrendered his keys, cell phone, and wallet before the questioning; and (4) after the interview, Lewis was questioned further, detained, and arrested.

Given this back and forth, we will assume—without deciding—that the first interview with the detective was custodial. But that assumption just begins the analysis because it is clear any error admitting evidence from the first statement was harmless beyond a reasonable doubt. See *Hebert*, 277 Kan. at 76-77 (admission of unwarned custodial statements harmless when subsequent, nearly identical warned statements were admissible); see also *Arizona v. Fulminante*, 499 U.S. 279, 295-96, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (admission of involuntary confession is amenable to harmless error analysis because error is similar to erroneous admission of other types of evidence subject to harmlessness analysis, including evidence admitted in violation of defendant's Fourth, Fifth, and Sixth Amendment rights).

We discern nothing of substance from the first interview that could have had any importance for Lewis' subsequent prosecution. And there is no reasonable possibility this insubstantial evidence affected the jury's verdicts given the overwhelming evidence of Lewis' guilt as discussed in this opinion. The real question is whether any procedural error in failing to *Mirandize* Lewis before the first interview renders inadmissible the incriminating statements he made after being *Mirandized* in the joint interview with the detective and CID agent. We hold those statements, which were substantive for the prosecution, were admissible. *Hebert* is analogous.

In *Hebert*, a law enforcement officer solicited incriminating statements from the defendant before *Mirandizing* him. The defendant then made additional incriminating statements. The court concluded the pre-*Miranda* statements should have been suppressed; but because there was no evidence the officer used co-

ercive tactics to obtain the pre-*Miranda* statements, admissibility of the post-*Miranda* statements turned on the analysis in *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). *Herbert*, 277 Kan. at 71-72.

In *Elstad*, the Court held:

"[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. *A subsequent administration of* Miranda *warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.* In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." (Emphasis added.) 470 U.S. at 314.

Applying *Elstad*, the *Hebert* court held the admissibility of the post-*Miranda* statements hinged on whether the statements were knowing and voluntary. 277 Kan. at 76 (citing *State v. McCorkendale*, 267 Kan. 263, 270, 979 P.2d 1239 [1999], *disapproved on other grounds by State v. King*, 288 Kan. 333, 204 P.3d 585 [2009]). The court observed there was no indication defendant's mental condition was impaired; the officer was calm and professional during the interview; defendant's handcuffs were removed; and the entire interview lasted 2 hours. Accordingly, the court held the post-*Miranda* statements were admissible. *Herbert*, 277 Kan. at 76-77.

Lewis cites *Missouri v. Siebert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), in an effort to distinguish *Elstad*. But *Siebert* only demonstrates the contrast in the factual circumstances. In *Siebert*, 542 U.S. at 615-17, the Court held a *Miranda* warning did not remove the taint from a defendant's earlier unwarned custodial statements. The officers took the defendant to a police station in the middle of the night and questioned her without *Miranda* warnings until she confessed involvement in an intentionally set fire, as well as her knowledge that an individual who died in that fire was an intended victim. After the confession, the police *Mirandized* her and continued the interview, which included confronting her with the pre-*Miranda* statements. These circumstances caused the Court to hold the mid-questioning *Miranda* warning

did not remove the taint from the unwarned custodial questioning because:

"The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that [the defendant] retained a choice about continuing to talk." 542 U.S. at 616-17.

It is easy to see the features distinguishing Lewis' case from *Siebert*. The pre-warning interview lasted only 10 minutes with nothing of substance revealed. Lewis did not admit involvement in the crimes, and the detective did not ask whether he was involved. Also, a different person (the CID agent) issued the *Miranda* warnings prior to the second interview; and unlike *Siebert*, it is clear neither the detective nor the agent attempted to elicit an unwarned confession from Lewis or exploit any unwarned statements after the *Miranda* warnings were given. More notably, Lewis showed he understood his rights when he terminated the second interview and asked for an attorney when the DNA subject arose. In short, this is not a *Siebert*-type case.

We hold the incriminating statements solicited from Lewis in the second interview and introduced at trial were not tainted by the failure to *Mirandize* him before the first interview, assuming the first interview was custodial. Lewis advances no claim the statements given in the second interview were not knowingly and intelligently made, and the record would not support such an assertion. The district court correctly denied the motion to suppress Lewis' statements and the evidence obtained based on those statements.

## EYEWITNESS IDENTIFICATIONS

Lewis next challenges the district court's refusal to suppress a pretrial eyewitness identification made by a victim (V.D.D.), arguing the photo lineup used by police was unnecessarily suggestive because Lewis was depicted in Army fatigues, while the other pho-

tos depicted men in civilian clothing. Lewis extends this argument to include the victim's courtroom identification of him as her attacker, arguing that identification was tainted by the photo lineup error. Lewis did not object to V.D.D.'s courtroom identification, so that issue was not preserved. See *State v. Gaona*, 293 Kan. 930, 954, 270 P.3d 1165 (2012) ("If a party fails to make a specific contemporaneous objection to the admission of evidence or testimony at trial, objection to that evidence or testimony is not preserved for appeal."). Some additional facts are necessary for the analysis of the pretrial witness identification issue.

At a pretrial hearing on Lewis' motion to suppress the out-of-court identification from the photos, the only witness was a Riley County police detective who testified she presented six photos to V.D.D. the day after Lewis was arrested. The detective could not reach V.D.D., who worked at Fort Riley, before the arrest. There had been media coverage about Lewis' arrest, and V.D.D. acknowledged to the detective knowing the arrest had been made. But the detective said she was satisfied V.D.D. had no indication from any outside source what Lewis looked like or that he was in the military. V.D.D. had denied seeing any television coverage or hearing any description of Lewis when asked about it.

The photos shown to V.D.D. were selected by computer using a software program to produce photographs with similar features to the attacker's physical description previously given by V.D.D. The photographs were stacked one on top of another with Lewis' somewhere in the middle. The detective acknowledged Lewis' Army fatigues were visible in his photograph and that no other photograph featured a person wearing similar clothing.

The detective gave the stack to V.D.D. upside down and asked her to go through the photos one at a time. V.D.D. complied, pausing for a couple of seconds on each one. After V.D.D. went through the photographs, she immediately picked out Lewis. The detective asked V.D.D. if she was sure, and she said, "I'm sure." The detective also testified V.D.D. previously had been shown other photographs—none of Lewis—before the arrest and had not identified any other individual as her attacker. The time between the crime and the photo lineup identifying Lewis was 33 days. On

cross-examination, the detective did not recall V.D.D. ever saying her attacker was a soldier, although she never asked if anyone had told V.D.D. the person arrested was a soldier.

The district court held the photo identification was not unnecessarily suggestive and would be admissible into evidence.

At trial, V.D.D. described her opportunities to see her attacker. She encountered Lewis when she answered a knock on her apartment door. Lewis told her someone had hit her car in the parking lot and she needed to come outside. As she was getting ready to close the door, he forced his way into the apartment and pulled a black gun out of his pants. He was wearing all black except for a grey scarf around his neck and a green arm band from Club Eve's, where V.D.D. had been earlier in the evening. She said the scarf kept falling off, permitting her to see Lewis' face throughout the encounter. Lewis demanded V.D.D. take him to an ATM, but she refused because her children were in the apartment. He threatened to hurt the children unless V.D.D. had sex with him, and he then raped and sodomized her. When Lewis left the apartment, V.D.D. watched him as he walked to his car, sat in it for about 5 minutes with the interior lights on, and then drove away.

In court, V.D.D. identified Lewis as her attacker without prompting. She also identified the evidence seized from Lewis' barracks and roommate's car, *i.e.*, the grey and black scarf she said was hanging around Lewis' neck during the attack; Lewis' roommate's car, which she had seen the night of her attack; and a photograph of the firearm. At another point in the trial, testimony was admitted that DNA evidence obtained from V.D.D. after the attack was matched to Lewis.

After V.D.D. testified, the detective who conducted the photo lineup was called and asked about the photo lineup conducted with V.D.D. When the detective was asked whether V.D.D. had selected Lewis' photograph from the stack, Lewis' trial counsel objected, stating simply that the lineup was "unduly suggestive." The district court overruled the objection based on its denial of the pretrial motion to suppress. The detective then answered that V.D.D. had selected Lewis' photo without hesitation.

*Standard of Review*

A two-step process is used by district courts to determine whether eyewitness identification is admissible evidence. First, the court determines if the police procedure used to obtain the original out-of-court identification was unnecessarily suggestive. If so, the analysis moves to the second step to consider whether there was a substantial likelihood of misidentification under the totality of the circumstances. *State v. Cruz*, 297 Kan. 1048, 1059, 307 P.3d 199 (2013); *State v. Mitchell*, 294 Kan. 469, 476, 275 P.3d 905 (2012).

An appellate court reviews a district court's decision to admit or suppress an eyewitness identification as a due process determination involving a mixed question of law and fact. The reviewing court applies a substantial competent evidence standard to the trial court's factual findings and a de novo standard to the ultimate legal conclusion drawn from those facts. *Cruz*, 297 Kan. at 1058-59.

*Discussion*

A pretrial identification procedure is unnecessarily suggestive when the officers conducting it give the witness information that highlights an individual before the selection is made or make suggestions about who the witness should select. In particular, a photo lineup is unnecessarily suggestive if the individuals depicted do not fit within the witness' description or if there is a gross disparity between the defendant's photograph and the others. *State v. Corbett*, 281 Kan. 294, 305, 130 P.3d 1179 (2006) (quoting *State v. Trammell*, 278 Kan. 265, 273, 92 P.3d 1101 [2004] [lineup not unnecessarily suggestive when another suspect's photograph not included]). The challenge Lewis raises is that his photo was the only one with the subject wearing military clothing.

The district court ruled the photo lineup was not unnecessarily suggestive on two occasions. Prior to trial, the court noted the photographs were the same size; of African-American males; and of people with short hair and moustaches "to some degree." It further noted each photograph revealed "a little bit of the shirt." It correctly acknowledged Lewis' photograph was the only one with the subject clearly wearing military fatigues, but it discounted this

because there was no evidence V.D.D. knew the arrestee was in the military or that her attacker was a soldier.

The record on appeal supports the district court's pretrial ruling. Specifically, the only witness who testified, the detective who composed and conducted the lineup, said she was unaware V.D.D. received any information the person arrested had any military connections. And the photo lineup itself matches the description given by the district court. The only aspect of the photos that makes Lewis standout is that he is dressed in military clothing while the others are not.

A review of cases from other jurisdictions shows differences in clothing worn by the accused in a photo array—as compared to what the other subjects wore—has not been seen as an indicator of unnecessary suggestiveness. See, *e.g.*, *Briscoe v. County of St. Louis, Missouri*, 690 F.3d 1004, 1014 (8th Cir. 2012) (rejecting claim of suggestive lineup based, in part, on other participants not resembling defendant in appearance or clothing); *Heng v. State*, 251 Ga. App. 274, 276-77, 554 S.E.2d 243 (2001) (discussing cases in which array not suggestive due to clothing disparities). Since the district court did not have any evidence suggesting V.D.D. was influenced by the military fatigues, the district court's pretrial ruling was proper.

But Lewis renewed his objection at trial after facts suggesting V.D.D. might have known or suspected her attacker had some military connection. Whether the district court's trial ruling was proper is a closer call. The issue Lewis advances is whether a specific consequence of the clothing disparity, *i.e.*, identifying him as a soldier, suggested to V.D.D. that Lewis was the person she should identify. See *Heng*, 251 Ga. App. at 277 (holding lineup unnecessarily suggestive when defendant only subject depicted in unusual jacket exactly matching witness' description of perpetrator's clothing). And as Lewis points out, the record contained information implying V.D.D. might have known or suspected her attacker had some military connection.

For instance, she testified at trial that the car that followed her from the club the night she was attacked had military tags. She also said she thought she saw the car that followed her parked at Fort

Riley. Additionally, she had previously identified a man in a Fort Riley dining hall as possibly being her attacker. This testimony was elicited before Lewis' trial objection, and we cannot help but note defense counsel did not alert the district court that new facts were introduced calling its pretrial ruling into question.

V.D.D.'s testimony suggesting she thought her attacker had military ties renders reliance on the court's pretrial analysis questionable. We can only speculate on whether the district court would have reached a different conclusion if defense counsel had presented a fully formed objection calling the new evidence to light. Regardless, we will assume—without deciding—that the photo lineup was unnecessarily suggestive based on the totality of the record. And on that assumption, we still have no hesitancy concluding the identification carries independent reliability and that there is no substantial likelihood of misidentification under the second prong of our analysis.

When analyzing that prong, this court weighs eight factors: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation; (6) the witness' capacity to observe the event, including his or her mental and physical acuity; (7) the spontaneity and consistency of the witness' identification and the susceptibility to suggestion; and (8) the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly. *Corbett*, 281 Kan. at 305.

The record shows: (1) V.D.D. testified her attacker's face was fully revealed to her and she had multiple opportunities to see him before, during, and after the attack; (2) V.D.D.'s description of Lewis and his clothes were consistent at the preliminary hearing and trial; (3) the identification from the photo lineup took place about a month after the crime; (4) the parties agree V.D.D. did not equivocate in her identification of Lewis as her attacker; (5) there was no evidence indicating V.D.D.'s ability to observe her attacker was diminished; and (6) V.D.D.'s identification was corroborated by physical evidence, including the DNA.

On balance, the totality of circumstances demonstrate V.D.D.'s identification was reliable, despite any infirmities in the photo lineup procedure—particularly V.D.D.'s up-close encounter with Lewis during the home invasion and sexual assault, her testimony that she saw Lewis' face during the attack, and her certainty that she correctly identified him in the photo lineup. There is not a substantial likelihood of misidentification, even if we assume a potentially suggestive photo lineup. Admitting the testimony about the photo lineup and V.D.D.'s in-court identification was not error.

## MOTIONS FOR CONTINUANCE

Lewis argues next that the district court violated his due process rights by infringing upon his right to present a defense when it refused to grant him a continuance to obtain independent DNA testing and retain an expert witness. The State argues Lewis had sufficient opportunity to obtain testing prior to requesting the continuance on the eve of trial. Again, some background is required.

Less than 3 weeks before trial, Lewis moved for a continuance. He argued a new attorney had been appointed about 4 months earlier; the case could result in him being imprisoned for the rest of his life; the State had recently prevailed on its motion to admit K.S.A. 60-455 evidence of similar offenses; and his counsel lacked sufficient time to prepare. At a motions hearing, the State objected. The district court denied the continuance, finding that the defense had adequate time to prepare for the K.S.A. 60-455 evidence; a continuance would delay trial by several months; the State had arranged for witnesses to come from out-of-state; and other witnesses planned to leave the area.

Eight days before trial, Lewis filed an amended motion to continue. As additional support, he averred the State intended to introduce DNA evidence; he had retained a laboratory to perform independent DNA testing and review the DNA evidence; the results could be exculpatory; additional time was needed to obtain results; and he had filed a motion for production of known DNA evidence and a corresponding motion for additional discovery. The State again objected.

Lewis argued the additional DNA testing was crucial to his defense, not only to verify the KBI's results but to assist in preparing cross-examination of the State's DNA experts. Lewis' attorney characterized her involvement in his case as "fairly recent," emphasized her heavy caseload, and said Lewis had received a prosecution report with new DNA evidence results from the steering wheel of a victim's car just prior to the hearing. The State argued Lewis' attorney received discovery including the State's DNA analysis results when she was appointed in May and emphasized witnesses were travelling from around the country to appear at trial.

The district court denied the motion. As to the new matters pertaining to DNA, the court clarified it was not denying Lewis the right to obtain additional testing, and the State agreed to provide Lewis the materials required by the laboratory the defense had retained.

### Standard of Review

A continuance may be granted for good cause. K.S.A. 22-3401. A district court's ruling on a motion to continue is reviewed for an abuse of discretion. *State v. Beaman*, 295 Kan. 853, 862-63, 286 P.3d 876 (2012) (citing *State v. Stevens*, 285 Kan. 307, 322-23, 172 P.3d 570 [2007], and *State v. Carter*, 284 Kan. 312, 318, 160 P.3d 457 [2007]). A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the trial judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. *State v. Huddleston*, 298 Kan. 941, 960, 318 P.3d 140 (2014). Whether the district court has interfered with a defendant's right to present his defense is reviewed de novo. *Carter*, 284 Kan. at 318-19.

### Discussion

The court's decision in *State v. Snodgrass*, 252 Kan. 253, 843 P.2d 720 (1992), on which the State relies, is directly on point. In that case, defendant moved just 2 days prior to trial for DNA testing of physical evidence collected during the rape investigation that led to the charges against him. Defendant claimed he learned only

a week earlier of a hospital lab report showing the presence of semen in the victim's vaginal fluids. And because KBI tests were inconclusive, defendant argued he needed independent testing to exclude himself as a possible donor. The district court denied the request because defendant knew the rape kit evidence existed and could have requested the tests much earlier and the case had been continued previously for psychological testing pertaining to a later-abandoned insanity defense. The district court also refused to order DNA testing.

On appeal, the *Snodgrass* court affirmed, holding that under the circumstances it could not be said that no reasonable person would take the view adopted by the trial judge. In so holding, the court noted the defendant's "ample opportunity to request DNA testing long prior to two days before trial" and that defendant was solely responsible for the delay in requesting the tests. 252 Kan. at 264.

The facts here are nearly identical. Lewis was aware much earlier that the physical evidence existed and could have pursued independent DNA testing prior to 8 days before trial. And the circumstances are no less persuasive because Lewis' new attorney was appointed 4 months prior to the motion for continuance since Lewis' first attorney was in the case approximately 6 months prior to that and did not pursue independent DNA testing.

It cannot be said no reasonable person would adopt the trial court's decision to deny the continuance and proceed with the trial or that the decision deprived Lewis of the right to present his defense, given the time available to the defense. See *State v. Ly*, 277 Kan. 386, 389-90, 85 P.3d 1200 (defendant not entitled to continuance because he received ballistics results; defendant knew State was analyzing the evidence and could have requested independent testing prior to 4 days before trial), *cert. denied* 541 U.S. 1090 (2004); see also *State v. Wells*, 289 Kan. 1219, 1235, 221 P.3d 561 (2009) (right to present defense subject to statutory rules of evidence and procedure and caselaw interpreting them); *Carter*, 284 Kan. at 319-20 (considering defense diligence or lack thereof in pursuing matter upon which motion to continue was based when assessing whether denial of motion was abuse of discretion). We

hold the district court's decision to deny the continuance was not error.

## PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS

Lewis raises several instances of alleged prosecutorial misconduct during closing argument. He claims the prosecutor improperly appealed to the jury's passions and prejudices with statements playing on the jury's sympathy for the victims and an inflammatory remark about Lewis. The State concedes statements specifically about the crimes' impact on the victims were improper but argues the remaining statements were within the latitude afforded to prosecutors in crafting arguments.

### *Standard of Review*

Appellate review of a prosecutorial misconduct claim based on improper comments requires a two-step analysis. First, an appellate court decides whether the comments at issue were outside the wide latitude a prosecutor is allowed, *e.g.*, when discussing evidence. If so, there was misconduct. Second, if misconduct is found, an appellate court determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *Bridges*, 297 Kan. at 1012.

Prosecutors enjoy wide latitude in crafting closing arguments. *State v. Scott*, 271 Kan. 103, 114, 21 P.3d 516 (citing *State v. Miller*, 268 Kan. 517, Syl. ¶ 4, 997 P.2d 90 [2000]), *cert. denied* 534 U.S. 1047 (2001). This latitude allows a prosecutor to make reasonable inferences based on the evidence, but it does not extend so far as to permit arguing facts not in evidence. *State v. Tahah*, 293 Kan. 267, 277, 262 P.3d 1045 (2011). Arguments must remain consistent with the evidence. If they are not, the first prong of the prosecutorial misconduct test is met, and on appellate review the court must consider whether the misstatement prejudiced the jury against the defendant and denied the defendant a fair trial. *Bridges*, 297 Kan. at 1014.

Appellate courts consider three factors in analyzing the second step: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part;

and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. But none of these factors individually controls; and before the third factor can override the first two, an appellate court must be able to say the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. *State v. McCullough*, 293 Kan. 970, 990-91, 270 P.3d 1142 (2012).

When both constitutional and nonconstitutional errors clearly arise from the same acts and omissions, an appellate court begins with a harmlessness analysis of the constitutional error. If the constitutional error is reversible, an appellate court need not analyze whether the lower standard for harmlessness under K.S.A. 60-261 also has been met. *Bridges*, 297 Kan. 989, Syl. ¶ 16. Under both standards, the party benefiting from the error bears the burden to demonstrate harmlessness. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013).

*Statements at Issue*

Lewis objects to several statements the prosecutor made in the course of closing arguments. First, he focuses on this passage:

"This has been a long process. We've heard from six women described what probably would have been the most horrifying events in their lives. There is some things that we all know. We know that women have rights. When they are at home in their home, they have the right to feel secure in their home. Their home is their castle. We also know that they have the right to leave their homes to go to a friend's birthday, Junction City, for a couple of hours, and return home. They have a right to go to celebrate their own birthday, even if they don't drink, and return home. They have a right to come from Topeka to Manhattan to catch up with an old friend, to go visit another friend, and to be secure. Most of all, they're entitled to dignity. They're entitled to say who can and cannot touch them, and they have an absolute right not to have that dignity invaded. That's not what happened."

Second, Lewis objects to a comment made during the prosecutor's discussion of the evidence relating to V.D.D.:

"But she had a right to open that door, and she had a right to tell the defendant, who she identified in court, that she wasn't gonna go out and see who had hit her

car. She had a right to say, 'I'm not going with you to an ATM,' and she had the right to shut the door and to send him packing."

Third, he challenges a comment made during the prosecutor's discussion about the attack on another victim, A.G.:

"We're gonna jump ahead to May 21st. [A.G.] comes down here to visit a friend. Goes to Bushwhackers, as [A.T.] had on the 6th and 7th. Goes out to Gardenway to see a friend. Gets out of the vehicle, and what's she rewarded with? What dignity is she shown? What respect is she shown? Absolutely none."

Fourth, Lewis objects to two comments by the prosecutor on the K.S.A. 60-455 evidence concerning a Virginia woman (K.D.), whom the State alleged Lewis had raped in 2006:

"Beginning in 2006, in Fairfax County, Virginia, when [K.D.] was struck on the left side of her face, knocked down, sodomized and raped for an hour, by the man she sat on that witness stand yesterday and identified, what was she in fear of? She was in fear of dying. Like [V.D.D.], she never went back to her home. People don't deserve to live like that. They shouldn't have to fear. They shouldn't have to move. But because of the defendant seated to my left, these two women moved out of their homes."

Fifth, Lewis objects to the prosecutor saying:

"Inside these four walls, justice. Those young women that took the stand and testified quietly, some of them not wanting to—having difficulty speaking up, they're entitled to justice, just as each and every human being is entitled to justice. Entitled to have dignity respected, and when it's not respected, entitled to justice.

"As hard as he tried, the defendant did not take their dignity. They've gone on with their lives, they've maintained employment, but they will never be the same. Never be able to go to a friend's birthday party in Junction City and drive home without looking in their mirror, wondering if they're being followed. Pull into an apartment complex to see a friend without worrying, is their somebody? Is there a masked man with a gun out there? Return to their own home, take a bath or shower in their own home feeling secure. They will never be able to do that again.

"Well, today, September 24th, 2009, is their day, because today you are gonna speak."

And finally, Lewis argues the prosecutor made an inflammatory statement about him:

"Masked, while [K.D.] trying to take a bath, sodomized, and raped, and forced to go to an ATM machine, like he's entitled. There is an entitlement. An entitlement to abuse women. That's what happened with every one of these women."

*Discussion*

There is no question some comments were improper, particularly the prosecutor's statements regarding justice "within these four walls" and urging the jury to give the victims "justice." Because a prosecutor may not make comments intended to inflame the jury's passions and prejudices, this prosecutor's irrelevant statements concerning the crimes' impact on the victims and references to the victims' dignity crossed an obvious line. And the parties are correct that the prosecutor inappropriately discussed the crimes' long-term effects on the victims, such as not returning to their homes, being afraid in their homes, and fearing being followed home.

"[T]he prosecutor must guard against anything that could prejudice the minds of the jurors and hinder them from considering only the evidence adduced." *State v. Ruff*, 252 Kan. 625, 636, 847 P.2d 1258 (1993). The comments noted were irrelevant to the question of Lewis' guilt. Their only purpose could have been to unnecessarily inject some consideration of sympathy for the victims' plights into the jury's deliberations. *Cf. State v. Friday*, 297 Kan. 1023, 1033, 306 P.3d 265 (2013) (improper to tell jury guilty verdict can return dignity crime took from victim; noting crime's impact upon victim's dignity not relevant); *State v. Anderson*, 294 Kan. 450, 463, 276 P.3d 200 (improper to tell jury truth would be victim's "redemption" and call the defendant "a little, little man who used a cowardly ambush in order to shoot and kill a man, father, son, a brother, and a husband . . . ."), *cert. denied* 133 S. Ct. 529 (2012); *State v. Henry*, 273 Kan. 608, 640-41, 44 P.3d 466 (2002) (improper to ask jury to consider irrelevant matter of crime's impact on victim's family).

But we reject Lewis' argument that the prosecutor's statement about Lewis acting with a sense of entitlement to abuse women was improper. As the State points out, prosecutors are permitted to draw reasonable inferences from the evidence. Part of the State's case was establishing Lewis' identity through a significant quantity of prior crimes evidence. And one of the victims (A.L.T.) testified about things her attacker said about feeling no remorse for his

victims, which tends to demonstrate the attacker did feel an entitlement to engage in the sexual assaults. See *State v. Flournoy*, 272 Kan. 784, 797-98, 36 P.3d 273 (2001) (not improper to call defendant "manipulator" and "control freak" in light of testimony defendant would say or do anything to save himself). The prosecutor's statement about an entitlement to abuse women was a reasonable and appropriate inference from this evidence.

Having determined some instances of prosecutorial misconduct, we must decide whether they require reversal. The convictions cannot stand unless we conclude beyond a reasonable doubt the improper comments did not affect the trial's outcome in light of the entire record. See *McCullough*, 293 Kan. at 990-91. Lewis argues the evidence of his guilt was not direct and overwhelming enough to dilute the misconduct's impact upon the jury. We disagree.

At the outset, we hold the improper comments were gross and flagrant and the product of ill will. The comments permeate the summation. See *State v. Akins*, 298 Kan. 592, 609-10, 315 P.3d 868 (2014) (repeated misconduct indicative of gross and flagrant conduct and ill will). And the rule against appealing to juror passions and prejudices is longstanding. See *Ruff*, 252 Kan. at 635-36 (applying rule against comments appealing to passion and prejudice); see also *Akins*, 298 Kan. at 609 (violation of longstanding rule indicates improper comment was gross and flagrant).

But the evidence of guilt was direct and overwhelming. Notably, there was no evidence to contradict the victims' testimony about the crimes committed against them. And the DNA evidence identified Lewis as the perpetrator of the V.D.D. and A.G. attacks. In addition, each victim identified items recovered from Lewis' possession as being similar to the ones used in the offenses against them.

Admittedly, the evidence of Lewis' guilt in the crimes relating to A.L.T. was less direct because there was no DNA evidence to connect him to them, and A.L.T. did not identify Lewis in court. But the evidence was nonetheless overwhelming enough to diminish any prejudicial effect stemming from the prosecutor's comments. The attack on A.L.T. was very similar to those on V.D.D.,

A.G., and two other victims who testified about attacks that occurred in another county. A.L.T. was accosted at gunpoint by a masked man in her apartment complex parking lot after returning from the same establishment A.G. visited just prior to her attack. A.L.T.'s attacker wore a mask that A.L.T. identified at trial as one police recovered from Lewis' possession. And police found a man's tennis shoe in A.L.T.'s car that shared the same size, make, and model with a new pair of shoes police recovered from Lewis' possession. Moreover, the jury's acquittal on the kidnapping charge is evidence the jury did not base its deliberations on the prosecutor's improper comments.

We hold the improper commentary was not so prejudicial as to deny Lewis a fair trial. In light of the DNA evidence, physical evidence, and victims' uncontroverted testimony—including the prior bad acts testimony of three additional victims in other jurisdictions—it is clear beyond a reasonable doubt these comments did not influence the jury's verdicts.

### DISTRICT COURT'S JURY QUESTION RESPONSE

Lewis next argues the district court erred when it responded to a mid-deliberation jury question prompted by its inability to reach a unanimous verdict on certain charges. The jury asked what would happen with those charges if it were unable to agree. After consulting with the parties, the district court directed the jury to refer to Instruction No. 3 from the final jury instructions, which read: "Your only concern in this case is determining if the defendant is guilty or not guilty. The disposition of this case thereafter is a matter for determination by the Court." At the time, Lewis did not object to this response.

Now on appeal, Lewis argues the district court should have responded with a portion of the language from PIK Crim. 3d 68.12, Deadlocked Jury, as follows: "If you fail to reach a decision on some or all of the charges, that charge or charges are left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charge(s) to a different jury at a later time." Lewis contends the response as given by the district court was coercive and misleading because it could be reasonably con-

strued as telling the jury it was required to reach a verdict and that a hung verdict was not acceptable. The State, of course, disagrees but raises preliminary questions of invited error and lack of preservation. A few additional facts are helpful.

Approximately 2 hours into its deliberations, the jury submitted a written question to the district court: "Can we find the defendant guilty on all but 2 Counts?" The district court responded: "Yes." The jury later inquired: "[I]f we are unanimous on all but 2 Counts are those 2 Counts gonna get thrown out or what will happen to those? (We are not unanimous on 2 Counts only by one vote Nay.)"

The discussion between the district judge and counsel concerning the jury's second question was as follows:

"THE COURT: We're back in chambers. Mr. Lewis is present, and counsel. We have another question from the jury. Once again, I'm not gonna read it word-for-word, because they've revealed numerically and otherwise how they stand, so I'm going to paraphrase it: If we are unanimous on some counts but not on others, will the others get thrown out, or what will happen to those?

"[THE STATE]: Well, I think the answer is probably that it would be the County Attorney's decision. They could be retried, or if he felt it was not necessary to pursue, they could be dismissed, but it would be up to the County Attorney to make that decision.

"[DEFENSE COUNSEL]: *I would just say something like you should not concern yourself with that issue.*

"THE COURT: I'm gonna refer them to Instruction No. 3. Your duty is to determine if the defendant is guilty or not guilty. The disposition thereafter is a matter for the Court." (Emphasis added.)

The district court's written response simply stated: "See instruction # 3." There was no further discussion by counsel, and the jury did not request further clarification. The next activity on the record was about 2 hours later when the jury announced it had reached its verdicts.

*Invited Error/Preservation*

In *State v. Bruce*, 255 Kan. 388, 397-98, 874 P.2d 1165 (1994), this court applied the invited error doctrine to the defendant's objection on appeal to the district court's response to a jury question. But the record in *Bruce* indicated defense counsel agreed to the response and replied "absolutely" when the response was read to

counsel for objection before giving it to the jury. 255 Kan. at 396; see also *State v. Adams*, 292 Kan. 151, 159, 254 P.3d 515 (2011) (invited error when defense counsel agreed to and signed a type-written response to jury question summarizing evidence); *State v. Cramer*, 17 Kan. App. 2d 623, 631-32, 841 P.2d 1111 (defense counsel said he "really [did not] have a problem with" responding to the jury's question with the State's proposed language), *rev. denied* 252 Kan. 1093 (1993). The same unequivocal approval is not present here.

Lewis' counsel suggested the district court only tell the jury not to be concerned with what might happen to any unresolved charges. But what the court did, in effect, by referring the jury back to Instruction No. 3 was to instruct the jury that its only concern was to determine whether Lewis was guilty or not guilty. The two responses are not the same thing. And while there may be some indication Lewis acquiesced to the court's proposed response, we think the better view is to reject the State's argument that Lewis invited the claimed error. We consider next the State's briefly asserted preservation argument.

K.S.A. 22-3414(3) provides in part:

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection *unless the instruction or failure to give an instruction is clearly erroneous.*" (Emphasis added.)

We have held K.S.A. 22-3414(3) establishes a preservation rule for jury instruction claims on appeal. If an instruction is clearly erroneous, appellate review is not predicated upon an objection in the district court. *Herbel*, 296 Kan. at 1121.

This court has applied this same preservation rule in the context of nonevidentiary, mid-deliberation jury questions. See *State v. Hoge*, 276 Kan. 801, 817-18, 80 P.3d 52 (2003) (holding defendant failed to preserve claim of error arising from allegedly erroneous jury question response because defendant did not object to response at trial and response was not clearly erroneous); *State v. Saenz*, 271 Kan. 339, 352, 22 P.3d 151 (2001) (citing K.S.A. 22-

3414[3] and holding error in manner in which district court responded to jury's question was harmless because defendant had opportunity to review and failed to object to response's content, which conformed to applicable PIK instruction). We do so here as well and hold this issue is preserved for appeal to the extent Lewis argues the response was clearly erroneous.

The next question is what standard of review applies. And given our prior recognition in *Hoge* and *Saenz* that clearly erroneous review was at least the nominal standard employed in two nonevidentiary, mid-deliberation jury question cases, clarification is appropriate.

*Standard of Review*

In *State v. Williams*, 295 Kan. 506, 510-16, 286 P.3d 195 (2012), we explained "clearly erroneous" is not a standard of review, *i.e.*, a framework for determining whether error occurred. Rather, it supplies a basis for determining if an error requires reversal. 295 Kan. at 515-16; see also *State v. Wade*, 295 Kan. 916, 920, 287 P.3d 237 (2012) ("Even if we agree with the State's premise that [defendant] presents a jury instruction issue here [when claim was erroneous jury-question response on point of law], we recently clarified that 'clearly erroneous' is not a standard of review at all.").

In deciding whether error occurred, a district court's response to a mid-deliberation jury question is reviewed for abuse of discretion. *State v. Novotny*, 297 Kan. 1174, 1186, 307 P.3d 1278 (2013); *Wade*, 295 Kan. at 920. In turn, in making this determination:

"[T]o the extent that it is necessary to determine whether the district court's response was a correct statement of the law, we are presented with a legal question, subject to unlimited review. But when looking at which legally appropriate response the court should have made, we accord the trial court the deference of looking to whether no reasonable person would have given the response adopted by the trial court." 295 Kan. at 921.

Instruction No. 3 was a standard PIK instruction and correctly stated the law. It was not coercive, even considering that it was given after the jury indicated it might be unable to reach a verdict on two counts. It did not mislead the jury into believing it had to render a verdict on all charges. And it did not carry the hallmarks

of a forcing-style instruction when compared, for example, with language in the pattern deadlocked jury instruction that explicitly directs the jury to attempt to reach a verdict. See PIK Crim. 3d 68.12 ("If at all possible, you should resolve any differences and come to a common conclusion."); see also *State v. Overstreet*, 288 Kan. 1, 19-20, 200 P.3d 427 (2009) (clearly erroneous to give modified version of PIK Crim. 3d 68.12 to jury that indicated it was unable to reach a verdict on a charge). A reasonable person could agree with the district court's decision to give the response that it gave.

Because we conclude there was no error, we need not engage in the clearly erroneous reversibility sequence set out in our recent caselaw. See *Williams*, 295 Kan. at 515-16.

## ALTERNATIVE MEANS OF COMMITTING RAPE

Lewis claims his right to a unanimous jury verdict was violated because rape is an alternative means crime and the State failed to adduce sufficient evidence to support each alternative means of committing the crimes as charged. In particular, Lewis argues the State failed to present evidence sufficient to support a jury's finding that Lewis raped V.D.D. and A.G. "by penetrating their female sex organs with (1) a finger, (2) the male sex organ, *and* (3) any object." This argument is without merit. See *State v. Britt*, 295 Kan. 1018, 1027, 287 P.3d 905 (2012) (holding methods of penetrating female sex organ set out in statute not alternative means, but factual circumstances in which material element, "penetration," may be proven).

## CUMULATIVE ERROR

Lewis asserts the cumulative error doctrine necessitates reversal. As noted above, we have determined or assumed the following errors occurred: (1) Even if the first interview between Lewis and the detective was custodial, it was harmless to admit evidence of Lewis' statements; (2) even if the photo lineup was unnecessarily suggestive based on the totality of the record, the identification was independently reliable with no substantial likelihood of misidenti-

fication; and (3) prosecutorial misconduct occurred but was not so prejudicial as to deny Lewis a fair trial.

The test for cumulative error is whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. But no prejudicial error may be found from this cumulative effect rule if the evidence is overwhelming against the defendant. *State v. Marks*, 297 Kan. 131, 150-51, 298 P.3d 1102 (2013).

In this case, the identified, or assumed, errors do not overtake the strength of the evidence against Lewis. This evidence was overwhelming as to his guilt based in significant part on the strength of the eyewitness testimony, DNA, other physical evidence, and prior crimes evidence. There was no reversible cumulative error.

### Sentencing Lewis as an Aggravated Habitual Sex Offender

Lewis next argues his five life sentences must be vacated because the aggravated habitual sex offender statute, as written at the time of his crimes, did not apply to him. The State argues it interpreted a "single conviction event" for the purposes of the statute to refer to convictions concerning the same victim, same offense date, or both. Because we agree with Lewis, we need not address the parties' alternative sentencing arguments.

*Standard of Review*

"The court may correct an illegal sentence at any time." K.S.A. 22-3504(1). Whether a sentence is illegal is a question of law subject to de novo review. *State v. Taylor*, 299 Kan. 5, 8, 319 P.3d 1256 (2014). An illegal sentence is: (1) a sentence imposed by a court without jurisdiction; (2) a sentence that does not conform to the applicable statutory provision, either in character or term of authorized punishment; or (3) a sentence that is ambiguous with respect to the time and manner in which it is to be served. 299 Kan. at 8.

*Discussion*

At the time of these crimes, Kansas law provided that "[a]n aggravated habitual sex offender shall be sentenced to imprisonment

for life without the possibility of parole." K.S.A. 2009 Supp. 21-4642(a). "Aggravated habitual sex offender" was defined as a person who:

"(A) Has been convicted in this state of a sexually violent crime . . . ; and

"(B) Prior to the conviction of the felony under subparagraph (A), has been convicted on at least *two prior conviction events* of any sexually violent crime." (Emphasis added.) K.S.A. 2009 Supp. 21-4642(c)(1).

A "prior conviction event" was defined as:

"[O]ne or more felony convictions of a sexually violent crime occurring on the same day and within a single court. These convictions may result from multiple counts within an information or from more than one information. If a person crosses a county line and commits a felony as part of the same criminal act or acts, such felony, if such person is convicted, shall be considered part of the prior conviction event." K.S.A. 2009 Supp. 21-4642(c)(2).

And the term "sexually violent crime" includes rape and aggravated criminal sodomy. K.S.A. 2009 Supp. 21-4642(c)(3)(A), (E).

Lewis' presentence investigation report showed prior convictions in Geary County District Court for rape, aggravated criminal sodomy, and criminal restraint. Each conviction was dated September 15, 2010.

This court's decision in *Trautloff* is directly on point. In that case, the defendant was convicted of multiple crimes, including rape and aggravated criminal sodomy. The district court found the defendant was an aggravated habitual sex offender and sentenced him to life without parole for the rape and aggravated criminal sodomy convictions. The defendant had prior convictions for rape and aggravated indecent liberties with a child. Both convictions occurred on the same date in the same case. On appeal, the court vacated the sentences imposed under K.S.A. 21-4642 and remanded for resentencing. The court held that "a conviction on a single day of multiple counts, even involving multiple victims, constitutes only one prior conviction event." And, turning to the facts of defendant's case, it held defendant's prior convictions, having occurred on the same day and in the same case, constituted only one "prior conviction event." 289 Kan. at 798.

In Lewis' case, the prior convictions in his presentence investigation report all occurred on the same day and in the same case in

Geary County and therefore constituted only a single prior conviction event. Because at the time of Lewis' crimes K.S.A. 2009 Supp. 21-4642 applied only to defendants with two prior conviction events, Lewis' five life-without-parole sentences do not conform with the statute and are illegal. We vacate those sentences and remand for resentencing on the counts for which they were imposed.

Convictions affirmed, life sentences vacated, and case remanded with directions.

BEIER, J., not participating.