NOT DESIGNATED FOR PUBLICATION

No. 121,956

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRADY ALLEN NEWMAN-CADDELL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; BRENDA M. CAMERON, judge. Opinion filed October 22, 2021. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., BRUNS and ISHERWOOD, JJ.

PER CURIAM: Brady Allen Newman-Caddell pleaded guilty to one count of aggravated kidnapping, one count of aggravated criminal sodomy, and two counts of rape. The State moved for an upward durational departure sentence based on the aggravating factors that Newman-Caddell (1) committed a crime of extreme sexual violence and was a predatory sex offender, and (2) exhibited the potential for future dangerousness. Newman-Caddell waived his right to a jury trial regarding these factors and stipulated to their existence. The district court conducted an extensive sentencing hearing which led it to conclude that both enhancement factors were established beyond a

1

reasonable doubt. It departed on the aggravated kidnapping count and one rape count, then sentenced Newman-Caddell to 660 months' imprisonment. On appeal, Newman-Caddell argues he is entitled to be resentenced because (1) aggravated kidnapping is not a "crime of extreme sexual violence" and (2) the aggravating factor of "future dangerousness" violates due process. We find that the district court properly concluded that both of Newman-Caddell's crimes of conviction are subject to classification as offenses of extreme sexual violence for purposes of an upward departure sentence. Following a comprehensive review of the evidence adduced at the sentencing hearing, we affirm the enhanced sentence imposed in accordance with that factor. Because a single factor is legally sufficient to sustain Newman-Caddell's departure sentence, we deem it unnecessary to delve into the merits of his challenge to the court's finding that he posed a risk of future dangerousness.

FACTS AND PROCEDURAL BACKGROUND

Late in the evening of October 7, 2016, H.J., a deputy sheriff at the Johnson County Sherriff's Office, left her Kansas City, Missouri, apartment and began driving to work to report for her overnight shift. She stopped at a QuikTrip along the way to purchase two energy drinks and then resumed her travels. Unbeknownst to H.J., another vehicle was mirroring her movements.

Shortly after parking in a parking lot directly south of the Johnson County Jail, H.J. noticed a dark, four-door sedan with two occupants pull along her left side. H.J. briefly waited to exit her vehicle to avoid bumping doors with anyone leaving the sedan. A few moments later, H.J. grabbed her duffel bag, energy drinks, keys, and phone and stepped out.

Just after exiting her vehicle, a man, later identified as William Luth, moved in very close to H.J. and asked her where he was. H.J. took a step to create a measure of

distance and asked whether he was lost. The man responded by striking H.J. repeatedly in the head and shoving her into the backseat of the sedan. H.J. dropped her cell phone but managed to hold onto her duffle bag and bring it into the car with her.

Luth got into the backseat and instructed the other individual, later identified as Brady Newman-Caddell, to start driving. Luth ordered H.J. to cooperate, patted her down, and began digging through her duffel bag. Presumably after discovering H.J.'s sheriff's attire and equipment, he asked if she was a cop. Luth shifted H.J. onto her back, pulled her sweatshirt up to cover her face, then removed her shirt and bra. Luth put his mouth and hand on H.J.'s breast, then removed her shoes, jeans, and underwear and instructed her to pull her legs up toward her chest. H.J. cooperated because Luth threatened that he had something shiny and sharp in the front seat, which H.J. interpreted to mean a knife. For the next 10-20 minutes, Luth penetrated H.J.'s vagina with his fingers and penis. He then ordered H.J. to roll over and inserted his penis into her anus.

Luth and Newman-Caddell concluded that it was time to switch places, so Newman-Caddell pulled over and exited the vehicle while Luth restrained H.J.'s hands. Once Newman-Caddell opened the rear passenger door, Luth climbed into the front seat while continuing to restrain H.J.'s hands. Newman-Caddell took control of H.J.'s hands and penetrated her vagina for about two minutes. Newman-Caddell then leaned forward, whispered an apology, and asked H.J. whether Luth had hurt her. Newman-Caddell then promised to get her out of the situation.

Luth told Newman-Caddell he wanted to switch positions so he could "finish," but Newman-Caddell refused and said it needed to end because he had to be at work early in the morning. Newman-Caddell then asked Luth whether there was anything they could use to wipe off H.J. and Luth handed him a bottle of Armor All. Newman-Caddell poured the chemical into his hand and wiped it over H.J.'s inner thighs and vagina. Newman-Caddell assisted H.J. in putting on her t-shirt, jeans, and shoes, but she did not put her bra

3

or underwear back on. Luth continued to drive for a long while as he and Newman-Caddell argued about where to drop off H.J.

H.J.'s assailants finally arrived at a destination suitable to their liking and ordered H.J. out of the vehicle with strict instructions to keep her sweatshirt around her head. She defied the directive as the vehicle drove away but was unable to get a clear view of the license plate. H.J. assessed her surroundings and upon seeing cornfields and the Lee's Summit water tower, she established her location.

H.J. made her way to the Jackson County, Missouri, Sheriff's Office and authorities transported her to a nearby hospital where she underwent a sexual assault exam. H.J. reported pain to her head and had abrasions to her knees and vagina, as well as anal tearing. The examining nurse collected several swabs for DNA purposes.

Investigators received a tip that Luth and Newman-Caddell were involved in the attack on H.J. and began surveillance. Eventually, both suspects were arrested, and a search of Luth's wife's car led to the discovery of H.J.'s watch, underwear, and bra, as well as the bottle of Armor All. Newman-Caddell was in possession of H.J.'s ID card.

DNA samples were collected from both men. A comparison to the swabs taken from H.J. revealed that Newman-Caddell could not be excluded as a contributor to the DNA collected through H.J.'s vaginal and rectal swabs. Investigators also found H.J.'s DNA inside Luth's wife's vehicle and on the underwear recovered from the car. Newman-Caddell's semen was also found on the backseat of that vehicle.

Sergeant Chris Evans of the Johnson County Sheriff's Office interviewed Newman-Caddell following his arrest. During the interview, Newman-Caddell initially denied involvement and suggested that his drink must have contained an illicit additive because he did not remember any details of that evening. He then stated that Luth held a

4

revolver to his head and told him that if he did not help Luth get H.J., then Luth would kill him. Eventually, Newman-Caddell admitted to participating in H.J.'s assault. He informed Sergeant Evans that Luth had identified several different women as potential victims that evening before setting his sights on H.J.

*Guilty Plea, Motion for Upward Durational Departure, and Waiver*

Newman-Caddell was charged with a single count each of aggravated kidnapping and aggravated criminal sodomy, as well as two counts of rape. The State also filed a notice of its intent to pursue an upward durational departure sentence based on the existence of two aggravating factors, that a current crime of conviction was one of extreme sexual violence and he was a sexual predator and that Newman-Caddell posed a risk of future dangerousness to the public safety.

Newman-Caddell ultimately pleaded guilty as charged but retained his right to contest the State's motion for an upward durational departure. He stipulated to the existence of both aggravating factors and waived his right to have a jury find the factors beyond a reasonable doubt. Prior to sentencing, Newman-Caddell filed a motion and corresponding memorandum asserting that a sentence shorter than the 495 months' imprisonment Luth received was appropriate because Newman-Caddell was more cooperative with police, perpetrated less violence during the attack, and insulated H.J. from further harm at Luth's hands.

*Hearing on Upward Durational Departure*

The court conducted a hearing on the State's motion at which time several witnesses, together with H.J., were called to bolster the State's contention that an enhanced sentence was warranted for Newman-Caddell. M.T., testified that she started dating Newman-Caddell on her 16th birthday and he became increasingly dominating as

5

the relationship progressed. The controlling behavior escalated into physical and emotional abuse, punctuated by instances in which he grabbed her mouth, slapped her face, choked her, terrorized her with a loaded rifle, and threatened to kill her father.

A second woman, O.A., testified about a relationship she shared with Newman-Caddell when they were around 19 years old. According to O.A., he immediately became controlling and abusive, often leaving her covered in bruises. Over the course of the relationship, Newman-Caddell slammed O.A.'s head against a car window, verbally abused her, strangled her, bit her, and abused their pet dog.

A third woman, T.H., testified to an incident that occurred while she was living with her two-and a-half-year-old daughter in an apartment in Independence, Missouri. One evening she turned in for the night around 10 p.m. with her daughter in her bed. Sometime after midnight, she woke to the sensation of hands over her mouth. Over the course of the hour that followed, three men repeatedly raped and sodomized her, even after her young daughter awoke and observed the attack. T.H. testified that she heard clicks and saw flashes from a cell phone after their assault ended. She heard her assailants remark that it was someone's birthday and they hoped he had fun. The assault on T.H. occurred on Luth's birthday.

T.H. informed the court that following the attack on H.J., she learned that an arrest had been made in connection with her case. The DNA evidence collected in H.J.'s case shared a connection with that collected in T.H.'s case. Newman-Caddell at first denied that he participated in the attack against T.H., but once investigators informed him that they had DNA evidence linking him to the assault perpetrated against T.H., he admitted to his involvement in the violent incident.

The State also called Dr. Gregory Saathoff to testify about the nature of Newman-Caddell's conduct and crimes. Dr. Saathoff is board-certified in neurology and psychiatry,

6

works in criminal psychiatry, consults for the FBI's behavioral analysis unit, served a stint as a psychiatrist for the United States military, testified before Congress as a psychiatrist, and boasts many scholarly publications. Dr. Saathoff reviewed Newman-Caddell's case files relating to each of the four victims who testified and completed a report outlining his findings in relation to the State's motion to depart.

Dr. Saathoff first noted that "the best predictor of future violence is past violence." He explained that Newman-Caddell exhibited both primary types of aggression—predatory and reactive. Predatory aggression, which involves planning, control, and timing, was, according to Dr. Saathoff, present in Newman-Caddell's attacks on T.H. and H.J. Reactive aggression, which is emotional, impulsive, provoked by external events, and often followed by remorse, was present in Newman-Caddell's attacks on M.T. and O.A. Dr. Saathoff did not believe therapy or drugs would reduce Newman-Caddell's dangerous nature and characterized him as a sexual predator.

*Sentencing*

The court found "beyond a reasonable doubt that there are substantial reasons to depart on all the factors that [the court] heard." It concluded that Newman-Caddell was a sexual predator and posed a future danger to society. The judge agreed with the State that a 660-month controlling prison sentence was appropriate and sentenced Newman-Caddell accordingly.

Newman-Caddell timely appealed.

*Whether the District Court's Imposition of a Departure Sentence Based Upon a Finding that Newman-Caddell's Convictions are Crimes of Extreme Sexual Violence Constituted an Illegal Sentence?*

Newman-Caddell contends that his upward departure sentence is illegal because the district court erroneously found that his aggravated kidnapping conviction fit within the definition of a crime of extreme sexual violence.

An illegal sentence may be corrected at any time while the defendant is serving his or her sentence. K.S.A. 2020 Supp. 22-3504(a).

> "'An illegal sentence is: (1) a sentence imposed by a court without jurisdiction; (2) a sentence that does not conform to the applicable statutory provision, either in character or term of authorized punishment; or (3) a sentence that is ambiguous with respect to the time and manner in which it is to be served." *State v. Lewis*, 299 Kan. 828, 858, 326 P.3d 387 (2014) (quoting *State v. Taylor*, 299 Kan. 5, 8, 319 P.3d 1256 [2014]).

See K.S.A. 2020 Supp. 22-3504(c)(1).

Newman-Caddell argues that "his sentence is illegal as it does not conform to the statutory provisions for departures." A sentence's legality is a question over which we exercise unlimited review. *State v. Jamerson*, 309 Kan. 211, 214, 433 P.3d 698 (2019). Resolution of this issue also demands a degree of statutory interpretation. The proper interpretation of sentencing statutes also raises a question of law requiring our unlimited review. 309 Kan. at 214.

"All Kansas courts use the same starting point when interpreting statutes: The Legislature's intent controls. To divine that intent, courts examine the language of the provision and apply plain and unambiguous language as written." *Jarvis v. Kansas Dept.*

*of Revenue*, 312 Kan. 156, 159, 473 P.3d 869 (2020). When doing so, courts must give "common words their ordinary meaning." *State v. Ryce*, 303 Kan. 899, 906, 368 P.3d 342 (2016), *aff'd on reh'g* 306 Kan. 682, 396 P.3d 711 (2017). "If the Legislature's intent is not clear from the language, a court may look to legislative history, background considerations, and canons of construction to help determine legislative intent." *Jarvis*, 312 Kan. at 159. Criminal statutes "must be strictly construed in favor of the accused." *State v. Williams*, 299 Kan. 870, 873, 326 P.3d 1070 (2014). "But the rule of strict construction is subordinate to the rule that the court's interpretation of the statutory language must be reasonable and sensible." 299 Kan. at 873.

The district court only departed upward on two counts, aggravated kidnapping and one of Newman-Caddell's rape convictions, counts 1 and 2 respectively. The justification the court relied on was that (1) Newman-Caddell committed crimes of extreme sexual violence and was a sexual predator and (2) he posed a risk of future danger to society. Newman-Caddell contends that aggravated kidnapping is not a crime of extreme sexual violence. Thus, because it does not conform to statutory requirements it amounts to an illegal sentence.

K.S.A. 2016 Supp. 21-6815(c)(2) lists the statutory factors that can be considered when imposing an upward departure sentence, one of which is whether the offender committed a "crime of extreme sexual violence" and is a sexual predator. K.S.A. 2016 Supp. 21-6815(c)(2)(F). The statute defines such an offense as:

> "(i) 'Crime of extreme sexual violence' is a felony limited to the following:
> (a) A crime involving a nonconsensual act of sexual intercourse or sodomy with any person;
> (b) a crime involving an act of sexual intercourse, sodomy or lewd fondling and touching with any child who is 14 or more years of age but less than 16 years of age and with whom a relationship has been established or promoted for the primary purpose of victimization;

9

(c) a crime involving an act of sexual intercourse, sodomy or lewd fondling and touching with any child who is less than 14 years of age;

(d) aggravated human trafficking, as defined in K.S.A. 21-5426(b), and amendments thereto, if the victim is less than 14 years of age; or

(e) commercial sexual exploitation of a child, as defined in K.S.A. 21-6422, and amendments thereto, if the victim is less than 14 years of age." K.S.A. 2016 Supp. 21-6815(c)(2)(F)(i).

Subsection (a) provided the foundation for the sentence imposed here. Newman-Caddell asserts that subsection is irrelevant and as support for that proposition, directs us to our Supreme Court's interpretation of that subsection in *State v. Spencer*, 291 Kan. 796, 248 P.3d 256 (2011). In *Spencer*, the court analyzed the sentencing guidelines departure provisions under Jessica's Law and noted that the crimes of extreme sexual violence referred to in subsection (a) "include[] rape, aggravated criminal sodomy, and aggravated indecent liberties perpetrated on children younger than 14." 291 Kan. at 825. Newman-Caddell argues that the statutory elements of rape and aggravated criminal sodomy include a nonconsent element where, by contrast, aggravated kidnapping does not. See K.S.A. 2020 Supp. 21-5503; K.S.A. 2020 Supp. 21-5504(b)(3); K.S.A. 2020 Supp. 21-5408. Notably, the *Spencer* court did not find that the crimes covered by the statute were limited to the exclusive list highlighted by Newman-Caddell.

Newman-Caddell advocates for the conclusion that because aggravated kidnapping itself does not include the lack of consent element shared by two of the three crimes identified by the *Spencer* court, this panel should interpret subsection (a) accordingly and find aggravated kidnapping is not a "crime of extreme sexual violence." Yet the fallacy in his argument is that the language of subsection (a) is plain and unambiguous. It provides that "a *crime* involving a nonconsensual act of sexual intercourse or sodomy with any person" is an aggravating factor under K.S.A. 2016 Supp. 21-6815(c)(2)(F)(i)(a). The Kansas Legislature intentionally used the general term "crime" in subsection (a). This broad and commonly used term encompasses all

10

violations of criminal statutes. More than once, the Legislature has displayed its ability to provide for specific features in a statute when that is its intention. In fact, it did so with the provision at issue by identifying specific offenses involving trafficking and children which it deemed to be crimes of extreme sexual violence. K.S.A. 2016 Supp. 21-6815(c)(2)(F)(i)(b)-(e). It would have done the same with the subsection we are analyzing had that been its intent. The only limiting language in subsection (a) is that the crime committed must involve "a nonconsensual act of sexual intercourse or sodomy with a person." Thus, the aggravating factor of "crime of extreme sexual violence" is applicable to those crimes that include acts of nonconsensual sex during their commission.

Count 1 of Newman-Caddell's complaint, which he pleaded guilty to, clearly outlines how the aggravated kidnapping involved a nonconsensual sex act:

> "COUNT 1-That between the 7th day of October, 2016 and the 8th day of October, 2016, County of Johnson and State of Kansas, BRADY ALLEN NEWMAN-CADDELL did then and there unlawfully, knowingly, and feloniously take or confine a person, to-with: H.J., by force, threat or deception, with the intent to hold such person to facilitate the commission of a crime, to wit: rape and/or aggravated sodomy, as defined in K.S.A. 21-5503, 21-5504, and/or to inflict bodily injury or to terrorize the victim, and did inflict bodily harm on such person, a severity level 1 person felony, in violation of K.S.A. 21-5408(b), K.S.A. 21-6804 and K.S.A. 21-6807 (aggravated kidnapping)."

Put simply, Newman-Caddell's aggravated kidnapping of H.J. involved a nonconsensual sex act because he committed it in furtherance of rape and aggravated sodomy, both of which bear a nonconsent element. See K.S.A. 2020 Supp. 21-5503; K.S.A. 2020 Supp. 21-5504(b)(3). We are satisfied that the aggravating factor of "crime of extreme sexual violence" applies to Newman-Caddell's aggravated kidnapping conviction and provides a solid foundation for his upward departure sentence. The district court's imposition of an enhanced sentence relying on this factor is affirmed.

11

As noted above, the district court also relied on the fact that Newman-Caddell posed a risk of future dangerousness to society when arriving at its conclusion that the crimes he committed demanded a departure from the status quo. Several women provided testimony that buttressed not only the finding that Newman-Caddell was a sexual predator under the first departure factor, but also that his volatile and abusive behavior placed members of society at risk. The court heard evidence of the sustained physical violence that he forced more than one of his romantic partners to endure, as well as the horrific acts of nonconsensual sex that he and two other men perpetrated against T.H., a young woman largely unknown to them. Additionally, Dr. Saathoff, a mental health expert with a specialty in criminal psychiatry, testified and advised the court that he reviewed the files relating to the relationships Newman-Caddell shared with each of those women, as well as the specifics of the criminal conduct involving T.H. Dr. Saathoff informed the court that Newman-Caddell is prone to both predatory and reactive aggression and is devoid of both empathy and conscience, much like what one would find in those who possess psychopathic traits.

Newman-Caddell raises an additional, intricate issue related to this factor. Because the first factor is sufficient standing alone to sustain the upward departure sentence imposed, we need not indulge in an analysis of the second factor.

Affirmed.